UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

FAITH MILLER-SETHI,

                                    Plaintiff,

- against -

CITY UNIVERSITY OF NEW YORK, DANI
MCBETH, NANCY SOHLER and ERICA
FRIEDMAN

                                    Defendants.
--------------------------------------------------------X

**Case No. 21-cv-8591**

**VERIFIED COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

Plaintiff Faith Miller-Sethi ("Miller-Sethi" or "Plaintiff"), by her attorneys, Jasper &

Jasper, PLLC, complaining of City University of New York ("CUNY"), Dani McBeth and Nancy

Sohler and Erica Friedman (collectively "Individual Defendants", collectively with CUNY

"Defendants"), alleges:

## NATURE OF CLAIMS

1.      Miller-Sethi was subjected to unlawful discrimination, a hostile work environment and

retaliation in response to her internal complaints of discriminatory treatment in her employment

with City University of New York School of Medicine (the "Medical School"), a member

institution of the CUNY university system of the City of New York, based on her race.

2.      Miller-Sethi is a Black woman of African-American descent.  She was hired as Clinical

Professor/Course Director for the Evaluation in Healthcare Settings course on or about January 9,

2019 and worked in the position for the Medical School, until she was unlawfully terminated on

the pretext of ministerial violations of administrative policy on or about August 26, 2020, when

she was terminated for the discriminatory reason of her race in retaliation for the protected activity

of complaining of discriminatory treatment and a racially hostile environment in her employment.

1

3.      Miller-Sethi was supervised and treated differently than other employees with similar job duties and responsibilities.  She suffered physical, emotional, economic and reputational damage as a result of the deliberately inhospitable and unwelcoming environment, including termination for complaining of the same.

4.      This proceeding is brought to remedy discrimination against Miller-Sethi by Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-d, *et seq.* ("Title VI"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the New York State Human Rights Law, Executive Law§ 290, *et seq.* (the "Executive Law"); and the New York City Administrative Code, § 8-101, *et seq.* (the "City Law").

5.      Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated, and punitive damages, and other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the claims herein arise under federal law.  The Court has supplemental jurisdiction over the claims brought under the Executive Law and the City Law, pursuant to 28 U.S.C. §§ 1367, as the remaining claims are so related that they form a part of the same case or controversy.

7.      On or about December 20, 2020, Plaintiff filed a charge of discrimination against CUNY with the United States Equal Opportunity Employment Commission (the "EEOC").  Pursuant to a work sharing agreement, a copy was also filed with the New York State Division of Human Rights.

8.      On or about July 22, 2021, the EEOC issued Plaintiff Notice of Right to Sue.  A true copy is annexed hereto as Exhibit A.

9.     Accordingly, Plaintiff's complaint herein has satisfied all administrative conditions and is timely.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York, and the parties are located within the Southern District of New York.

## PARTIES

11.     Dr. Faith Miller-Sethi is a natural person living in the State and County of New York.

12.     Miller-Sethi is a member of a protected class, as Black, African-American woman.

13.     Plaintiff is a Doctor of Public Health, Sociomedical Sciences, conferred from Columbia University School of Public Health.  She also holds an MPH, Population and Family Health from Columbia University, and a BA from Duke University.

14.     Dr. Miller-Sethi has worked in the sector of public health for approximately 25 years.  She is possessed with an understanding of the social determinants of health stemming from deep knowledge of the social and behavioral sciences and a diverse public health work history, including experience conducting community research, designing and implementing evidence-based programs in community settings, teaching about them within an academic medicine curriculum and leading a community development organization within a hospital.

15.     Defendant CUNY is a publicly-funded university system, comprised of senior and community colleges, graduate and professional schools, research centers, institutes and consortia.  Its headquarters and principal place of business is New York, New York.  Upon information and belief, at all times relevant hereto CUNY received and continues to receive federal financial assistance.

16.     Defendant Dani McBeth is now and at all times relevant to the allegations herein, the Associate Dean of Student Affairs for the Medical School.

17.     Defendant Nancy Sohler is an Associate Medical Professor at the Medical School, and all times relevant to the allegations herein was the Interim Department Chair of the Community Health and Social Medicine Department ("CHASM"), of the Medical School.

18.     Erica Friedman was appointed as Interim Dean of the Medical School in or about February, 2019 and held that position at and all times relevant to the allegations herein.

**FACTUAL ALLEGATIONS**

19.     Since on or about June 1, 2019 when Defendant Sohler assumed responsibility as the Interim Chair of the CHASM Department of the Medical School, until Plaintiff's unlawful termination in August 2020, Plaintiff was subjected to disparate treatment, excessive scrutiny and harassment based on her race.

20.     The Medical School has an intensive three-year sequence of courses in Community Health and Social Medicine offered through a like-named CHASM Department, which includes field placements in community medicine, in partnership with community-based health centers and health-related programs in underserved areas of New York City ("Community Sites").  Evaluation in Healthcare Settings ("EHS"), is a required course within the CHASM department.

21.     Plaintiff began her employment with CUNY on or about January 9, 2019, when she was appointed as a Clinical Professor to serve as Course Director for EHS.

22.     Chief among Plaintiff's responsibilities was to build and maintain relationships with Community Sites, supervise student placements at the Community Sites, and teaching the EHS course.

23.    Plaintiff's initial appointment was for the period from January 9, 2019, through August 26, 2019, with the prospect of renewals up to a total of seven years.  This position did not offer the possibility of tenure.

**Plaintiff Is Subjected to Disparate Treatment and a Lack of Professional Support**

24.    While the EHS course was normally prepared by the Course Director a year in advance, then-CHASM Department Chair Dr. Joan Dorn was anxious for the course to start and directed Plaintiff to roll out the course as-is based on the historical parameters for the course.  Plaintiff began the pre-orientation of students in January 2019, a few weeks after she ware hired.

25.    Notwithstanding the impossibly short schedule, in only a few months, Plaintiff, faced with record enrollment for the EHS course, had secured several additional Community Sites, growing the roster by approximately 25%, which she reported to Dr. Dorn.

26.    Plaintiff was completely self-directed in the relationship-building and Community Site procurement process.  Her work was conducted all over the five boroughs of New York City and Long Island.  Dr. Dorn expressed pride in Plaintiff's work and that she felt that Plaintiff was having a great deal of success in Plaintiff's new role.  By contrast, in or about the Fall of 2019, Defendant Friedman reported to Plaintiff that Friedman had scheduled a meeting with the head of Metropolitan Hospital, in part to secure it as a Community Site.  Defendant Friedman told Plaintiff that she was embarrassed that Plaintiff had already been there and established a Community Site relationship.

27.    Plaintiff repeatedly asked for a way to cover her travel expenses (sometimes, $50/day).  For the duration of her time at the Medical School, all of the expenses attendant to her work, were paid out of Plaintiff's own pocket.  Later, at a November 2019 faculty meeting, Plaintiff again

made the request for expense support and was informed that there would be a process to facilitate her reimbursement, which never materialized.

28.     From early on, as a means of supporting Plaintiff's transition to her position at the Medical School and her work with students, Plaintiff and Dr. Dorn met periodically.  Plaintiff volunteered updates to Dr. Dorn on her progress with developing the course each week.  These weekly check-ins were not mandated, nor were they in Plaintiff's job description, but rather were offered by Dorn to support Plaintiff.

29.     Despite their mostly successful working relationship, Dorn never provided Plaintiff with any substantive guidance for Plaintiff's EHS course within the context of the Medical School curriculum, never introduced Plaintiff to any other members of the faculty or staff, nor involved Plaintiff in any other aspects of the school community.

30.     Prior to Defendant Sohler acting as Interim Chair of CHASM, Plaintiff had had almost no interaction with Defendant Sohler.  During these initial months in Plaintiff's position, in or about May 2019, Defendant Sohler, attended only one regular department meeting and one other mandatory meeting with the mediator and these were the only interactions that Plaintiff had with Defendant Sohler.

Defendant Sohler Becomes Interim Chair of CHASM

31.     At the time that she became Interim Chair of the CHASM Department, Defendant Sohler had not been speaking to Plaintiff for several months and thereafter met with Plaintiff only a few times.

32.     Defendant Sohler routinely sent emails to Plaintiff asking for ministerial items, that had no urgency, to be completed by the close of business or otherwise on short notice, while not doing

the same to other faculty, who were not members of Plaintiff's protected class.  Because of her race, Plaintiff was not afforded the normal and expected autonomy inherent in any faculty position.

33.     Plaintiff was the only person in her department being so intensively scrutinized, all while she was successfully developing relationships that would benefit Defendant CUNY for years to come.

<u>The Fact of Plaintiff's Re-appointment is Deliberately Withheld from Plaintiff</u>

34.     In or about August 2019, Sohler, told Plaintiff that mistreatment claims made against Plaintiff in the Spring of 2019 – allegations, which Sohler knew were spurious as outlined *infra* - - might mean that Plaintiff would not be re-appointed.  Since Plaintiff was hearing feedback about this for the first time, and her initial appointment ended August 26, 2019, Plaintiff panicked and tried to track down information about her reappointment status.  Plaintiff had never received any written communication about any continuing appointment.

35.     Late, on the Friday evening before the August 26, 2019 expiry of her then-current appointment, Plaintiff received a return call from human resources to tell her that she had been re-appointed and should have received notification months earlier.

36.     Plaintiff was surprised to learn, on information and belief, that Defendant Sohler sat on the Executive Faculty Committee, which makes reappointment determinations, and thus Sohler was aware, six months before her remarks to Plaintiff that her re-appointment was in jeopardy in August 2019, that Plaintiff had already been re-appointed for the following year.

37.     Rather, Sohler deliberately wanted to cause Plaintiff distress.  It was not until the Spring of 2020, that Plaintiff obtained her reappointment letter from the prior year and only upon her request from the human resources department of the Medical School.

38.     On information and belief, no other faculty member outside of Plaintiff's protected class, was subjected to this sort of harassment and wonton distress caused by Sohler.

39.     As known to Sohler and determined in March of 2019, Plaintiff was re-appointed to her same title for the period beginning August 27, 2019 and ending August 25, 2020.

40.     Between Defendant Sohler's appointment as Interim CHASM Chair in or about May 2019, and January, 2020, Sohler and Plaintiff met only a few times: on or about August 22, 2019, September 6, 2019, in or about November 2019 and January 9, 2020.

41.     In their August meeting, Defendant Sohler acknowledged that demand of Plaintiff coordinating 86 Community Site placements required Plaintiff to spend most of her time in the field.  Sohler recommend that a grader be hired for the following year and as well as different adjunct professors for the EHS course.

42.     A few days after their last meeting in January 2020, by letter dated January 13, 2020, Defendant Sohler wrote Plaintiff a purported summary of their most-recent January 9, 2020 meeting (the "January 13th Letter").  Not only was the summary inaccurate of the content of the meeting, but it was a knowingly false recitation of several accusations leveled at Plaintiff.  On information and belief, no other faculty member outside of Plaintiff's protected class received similar, false and accusatory feedback.  To Plaintiff's shock, the January 13th Letter was littered with misrepresentations and falsehoods, some of which are described *infra*.

<u>Plaintiff is Falsely Accused of Submitting Grades Late</u>

43.     Sohler agreed Plaintiff's course grades would be due on Friday, August 9, 2019.  Since the relevant CUNY office was scheduled to be closed that day, it directed Plaintiff to submit her grades on the following Monday, August 12, 2019, which Plaintiff did. However, in the January 13th Letter, Defendant Sohler falsely represented that Plaintiff had submitted her grades late.  In support

of her contention that the grades were late, Sohler referenced a policy purported grades for non-clinical course should be submitted within one week of the end the course.  However, the Medical School describes Plaintiff's EHS course as a clinical encounter, where students experience "acting as part of a clinical team".

44.     Sohler had previously complained the grades for Plaintiff's course were 'always submitted late'.  This is a disingenuous criticism of Plaintiff, as others, and not Plaintiff, had previously taught the course.  Sohler was attempting to hold Plaintiff accountable for something allegedly done by Plaintiff's white predecessors.

45.     On or about July 22, 2019, Sohler informed Plaintiff, for the first time, that final grades needed to be submitted by August 3, 2019.  Plaintiff's clinical course, which ran eight weeks over the Spring and Summer, would not conclude until July 26, 2019, when final papers were due from students.  What is more, the building was closed the following day, and adjunct professors would not receive the final 20 page student papers for grading until on or about July 29, 2019.

46.     Sohler claimed Plaintiff's course was a Spring term course, the grades were already overdue, and had to be submitted by the August 3rd deadline, notwithstanding that the course ran through July and is listed by the Medical School on its 2019 curriculum map as a summer course.

47.     Plaintiff ultimately turned all of the grades around in or about a weeks' time.

48.     In tandem with the specious accusation of lateness, Defendant requested that Plaintiff include the due dates for student assignments in Plaintiff's syllabus.  Plaintiff had done so prior to teaching the course the first time and, had she not been wrongfully terminated, would have done so in the future sessions.

49.     In a further attempt to escalate the non-problem of Plaintiff's grade submissions, Sohler informed Plaintiff that Defendant Friedman was demanding the grades as soon as possible because

Friedman wanted to know if any student was failing or getting an incomplete in Plaintiff's course. Although Plaintiff was in the midst of reviewing the grades, in advance of the August 9th submission deadline, Plaintiff was able to convey the overall status of the class and reported to Sohler that all of the grades were above the B-range and that two students were getting incompletes: a student dismissed for disciplinary reasons and other student with an apparent medical absence.

Plaintiff is Wrongly Accused of Improper Handling of Dismissed Student

50.     On or about June 4, 2019, a preceptor (a Community Site contact/supervisor), wrote to Plaintiff informing her that a student (named herein as "AP"), would not be allowed to perform AP's field work at her Community Site.  Despite being dismissed, AP attempted to return to the site. The preceptor at the Community Site reported to Plaintiff that she considered AP to be dishonest, deceitful, entitled and condescending, and for these reasons, was unwilling to work with AP.  She stated that the student was not permitted on the premises of her facility; a point conveyed to AP directly by the Community Site manager.  This preceptor, the director of a nursing facility (an EHS training site since its inception, over 30 years ago), and a 20-year veteran of the EHS course, stated that AP was unlike any CUNY student she had ever worked with.  She stated that she knew that CUNY faculty were very committed and that she did not like what the student AP stated and inferred about Plaintiff.

51.     Plaintiff had previously tried to find AP an alternate placement.  AP had been offered a placement in the Bronx near Fordham University, which AP refused stating that she was not comfortable working in that area (she also indicated her discomfort traveling to the Medical School, located in Morningside Heights, in Manhattan).  Since another student had withdrawn from the course leaving a placement available in Staten Island, Plaintiff offered that placement to

AP as an alternative.  Plaintiff described the placement's area as similar to Long Island, where AP was from.  Plaintiff declined. Instead, she surreptitiously attempted to create a placement in Long Island, outside of Plaintiff's course, without authorization and too late to create the additional unauthorized slot.

52.     Without a new placement following her dismissal, AP also complained to Defendant McBeth, who responded by calling Plaintiff and Defendant Sohler to his office, with AP.

53.     In front of the student AP and Defendant Sohler, Defendant McBeth scolded Plaintiff and criticized her for AP's failed placement.  In discussing the course of the options that had been made available to AP, Defendant McBeth chided Plaintiff, "you don't know Long Island," assuming, without basis, that Plaintiff was unfamiliar with the community environment where AP lived or why AP might wish to decline working in the potential placements offered and tried (improperly) to create a placement in Long Island.  Not only was such a tongue lashing unprofessional, but on information and belief, it was motivated by racial animus and biased assumptions about Plaintiff's community experiences because of her race.

54.     Prior to this interaction, Plaintiff had never been introduced to or met Defendant McBeth. Nor was she familiar with his apparent role in the process of a new placement for a student who had been summarily dismissed from her previous placement.

55.     As they left the meeting Plaintiff told Defendant Sohler that Plaintiff was upset by Defendant McBeth's statements and believed that his treatment of Plaintiff was improper and abusive.  Sohler responded by telling Plaintiff that Sohler would report the incident to the human resources department, which later followed up with Plaintiff.

56.     Although the January 13th Letter falsely asserts that Plaintiff did not file a professionalism form nor inform appropriate administrators, following AP's dismissal for cause and unsuccessful

re-placement, Plaintiff submitted an extensive professionalism form (a form forwarded to Plaintiff by Defendant Sohler), to Defendant McBeth.  Defendant McBeth failed to act on it.  Several weeks later, when Plaintiff inquired about the status her submission to Defendant McBeth, Plaintiff was told that Plaintiff had submitted the wrong form and that McBeth would send Plaintiff the correct form.  Plaintiff completed and submitted this second form immediately.

57.     Both Defendant Sohler and Defendant McBeth failed to initiate any disciplinary procedures against this student.  On at least two occasions, Plaintiff also followed up with Dr Dorn, who was then the Discipline Committee, who said she was unaware of any professionalism reports regarding AP.

58.     As a result of not having a placement, AP was longer actively enrolled in the EHS course.  Sohler told Plaintiff that after Plaintiff submitted the professionalism form to Defendant McBeth, the process would run its course, and Plaintiff would not have to deal with AP further.  Had either Sohler or McBeth informed AP of this, or taken any other action, AP would not have shown up to Plaintiff's Mental Health First Aid workshop, which was part of the course AP was no longer permitted to take.

59.     When AP arrived at the course on a morning in July 2019, Plaintiff and her coordinator were shocked and, although no one else was nearby, Plaintiff took great pains to let AP know that the course was only for students presently working at Community Sites.  AP, embarrassed by her own error, went to Defendant McBeth, cried in his office, and told him that Plaintiff had publicly embarrassed AP.

60.     Defendant Sohler confided in Plaintiff in June 2019, that she believed that AP's behavior toward Plaintiff was motivated by racism.  However, Defendants went on to enable AP's abusive

and manipulative behavior and punished Plaintiff for holding AP accountable for her poor behavior at AP's placement.

61.     Although fully acquainted with the underlying facts and circumstances, Defendant McBeth responded by writing Plaintiff a scathing email, faulting Plaintiff for the situation, stating "you have to stop doing this".

62.     Plaintiff responded to receipt of this communication by reporting Defendant McBeth's inappropriate conduct to the Cornell Clarke of human resources, Chief Diversity Officer Diana Cuozzo and Carol Huang, a representative of the Professional Staff Congress, among others.

63.     While Defendant McBeth denied any wrongdoing in his treatment of Plaintiff, HR asked him to apologize to Plaintiff.  About a month later, McBeth went to Plaintiff's office and offered a non-apology: 'I don't think that I did anything wrong, but if you think that, then I'm sorry for that.'

64.     During a meeting in early November 2019 between Plaintiff and Defendant Sohler, Sohler made a revelation that shocked Plaintiff: AP -- the student dismissed from her placement and given an incomplete in Plaintiff's course -- had completed her EHS requirement.  Dumbfounded, Plaintiff asked what Sohler meant.  Defendant Sohler said "we took care of that situation and she's completed the course."  In or about June 2019, Plaintiff had been informed that it would be up to her determine whether AP would receive a failing grade or an incomplete and permitted to repeat the course in 2020.  While Plaintiff questioned how, why and when that had occurred, rather than give any further explanation, three times Sohler falsely insisted that she had informed Plaintiff previously.  Not only had she not informed Plaintiff of this backchanneling to pass one of Plaintiff's students, only a few months earlier, Defendants Sohler and Friedman had accepted

Plaintiff's report that AP was going to receive an incomplete in the EHS course because she did not complete the required 192-hour Community Site placement.

65.     Plaintiff was very upset and asked Defendant Sohler what Sohler thought about the impact of that decision to let a student, who was dismissed from her site, get away with her unprofessional behavior and not complete her 192 hours of fieldwork when all of the other students had, sometimes under very challenging circumstances.   Plaintiff pressed further, 'What about undermining me as course director?"  Defendant Sohler offered no response.

66.     Plaintiff told Sohler that she felt betrayed, disrespected and demeaned.  By giving AP a passing grade, without meeting the minimum threshold requirements (192 hours of field work), Defendants undermined the integrity of Plaintiff's work, her relationship with students, the credibility of the EHS program and medical school transcript, and Plaintiff's hard work in cultivating relationships with Community Sites.

67.     While this student, AP, whose behavior was deemed so egregious by her preceptor that she was forbidden from being on the premises, was rewarded with a passing grade, without completing any of the 192 field placement hours required of her classmates, Plaintiff was subjected to repeat written and unwarranted attack by Defendants, who perpetuated the false accusation that Plaintiff was somehow responsible for AP's dissatisfaction and embarrassment at the consequences of her own misconduct.

68.     Neither Plaintiff's white predecessors nor any other faculty member outside of Plaintiff's protected class was subject to such undermining treatment.

Plaintiff is Falsely Accused of Improperly Disclosing Student Grades

69.     The January 13th Letter complains that Plaintiff should not have notified students herself about their dismissal from their Community Site, with a tenured faculty member present.  This

colleague was a former director for the EHS course, with 21 years of experience at CUNY. She would never have agreed to be present, if she saw anything improper about what Plaintiff was doing.

70.    The only person who ever offered any substantive guidance through the duration of Plaintiff's employment was Dr. Erica Lubetkin, a tenured clinician and 21-year veteran of the CHASM department.  After the death of the prior full-time course director, she served as course director and taught the class in one of the intervening years between his death and the hiring of Plaintiff in January 2019.  She had full knowledge of the status of the course, so when Plaintiff reached out to the students, she also called Dr. Lubetkin, explained what happened and asked her if she would sit in as a witness to each discussion.

71.    In June 2019, Plaintiff had been trying to de-escalate a situation at a Community Site in the Bronx that 4 students were eventually dismissed from, for a few weeks, with several trips back and forth to the site.  When these 4 students were ultimately dismissed for bullying their peer student volunteers at this Community Site, as the Course Director, Plaintiff had an obligation to reach out to the students who were dismissed to inform them that they were not to report to their placements.   Plaintiff determined that this was not information that was appropriate to communicate via email, so she requested that the students come to her office, instead of reporting to their Community Sites.  In advance of a full day of field evaluations in the Bronx that was to begin at 10:00am, Plaintiff met with each student privately beginning at 8:00am.  At no point prior to the January 13th Letter was Plaintiff made aware that the Medical School or any of the Defendants considered that she had committed any infraction by conducting these meetings to notify her students.  Dr. Lubetkin, who is not a member of Plaintiff's protected class, received no similar criticism for her own participation.

72.     The January 13th Letter also pointedly accused Plaintiff of scheduling these student meetings to frustrate Defendant McBeth's plans to meet with these students himself.   On information and belief, Defendant McBeth's reported dissatisfaction with Plaintiff's handling of the situation and allegation of improper disclosures is merely retaliatory for Plaintiff having previously complained to the human resources department, Defendant Sohler, Defendant Friedman and others, about Defendant McBeth's conduct towards Plaintiff.

<u>Plaintiff is Falsely Accused of Mistreatment of Students</u>

73.     In her January 13th Letter, Defendant Sohler, knowing that the claims were erroneous and without merit, referred to eight reports of mistreatment by Plaintiff, filed by students as part of the EHS course evaluations.

74.     On or about September 6, 2019, when Defendant Sohler and Plaintiff met to discuss these reports, Defendant Sohler was categorically dismissive of them stating that she learned that students apparently file them all the time.   Notwithstanding her apparent position that the complaint process was subject to abuse by students, Defendant Sohler expressly noted the lack of validity of these specific reports against Plaintiff.   All the reports "mentioned public embarrassment," all of which Sohler knew to be inaccurate.

75.     As Sohler was entirely aware, prior to drafting the January 13th Letter, seven of the eight putative reports referenced the same alleged incident, using identical language, and alleged merely hearing about public embarrassment of a student (not the student purportedly making the complaint).   There were no facts to substantiate their accuracy and they are part of an apparent campaign against Plaintiff for permitting the dismissal for cause of AP from her placement.

76.     Critically, the eighth complaint referenced an experience of discrimination suffered by a student at her Community Site placement and was unrelated to anything said or done by Plaintiff.

77.     When Plaintiff reported to Defendant Sohler that this student had come to Plaintiff to report the incident and that Plaintiff had removed this site from the active list to protect future students, Defendant Sohler, verbally noted that the student did not understand that the mistreatment form was not supposed to be used for external experiences and that Plaintiff had not done anything wrong.  Nevertheless, Sohler knowing that these were not independent or legitimate mistreatment complaints, deliberately and manipulatively presented them in her January 13th Letter as if they were actually reflective of Plaintiff's performance.

78.     No other faculty member outside of Plaintiff's protected class was subject to similar mistreatment of being repeatedly accused of knowingly false accusations against Plaintiff.

79.     Defendant Sohler additionally referenced in the January 13th Letter Defendant McBeth's email to Plaintiff in July 2019 claiming that a student AP (who was dismissed from the placement for cause), felt embarrassed by Plaintiff's conduct, as detailed further *supra*.  As Defendant McBeth had been asked to apologize for his communication with Plaintiff, Plaintiff was stunned that it was restated in Defendant Sohler's letter as if it were a valid reproach of Plaintiff's conduct.

Plaintiff's Course Load is Subject to Disparate Scrutiny

80.     Within CHASM, Faculty are expected to facilitate problem-based learning sessions, a case study approach to learning problem solving in different core areas ("PBLs").  The January 13th Letter requests that Plaintiff identify the PLBs for which she would be "volunteering" in the upcoming Fall and Spring terms.

81.     While faculty are asked to facilitate these sessions (4 -2 hour sessions per module), in the semester, when one's own course is not in session, actual faculty participation is uneven.  Not long after insisting that Plaintiff's course grades were overdue because EHS was a Spring term course,

Sohler demanded that Plaintiff "volunteer" to facilitate PBLs in the Fall and Spring because Plaintiff was only teaching a Summer class.

82.     Other faculty, who are not members of Plaintiff's protected class, were permitted to entirely ignore requests to facilitate PBLs and at least two other, faculty, who are not members of Plaintiff's protected class, came into the office on just one day a week for a few hours to teach a single course, during Plaintiff's employment.

83.     Plaintiff shadowed a faculty member during the first module, then facilitated 3 PBL modules in the Fall of 2019.  When Sohler asked Plaintiff to facilitate, a specific PBL in the Spring 2020 term, Plaintiff expressed her apprehension about working with the class that she had just taught in the summer, where some students had levelled such negative personal attacks against Plaintiff.  Notably, a mandated, school-wide diversity training replaced two of Plaintiff's lectures in the midst of the course; the mandate was in response to serious racial incidents that had taken place before Plaintiff arrived at CUNY and had been poorly handled. This cohort, that had produced the seven specious (and one in error) mistreatment reports, also was permitted to report:

- o  'She's inarticulate'
- o  'She has this thing about being called 'doctor''
- o  'She's only concerned about her appearance'
- o  'What kind of class is this to lecture us about white supremacy, what kind of school is this, she should be fired…'

84.     Around the same time, another Black faculty member at the Medical School, privately agreed that as some of the few Black, female faculty (a group that historically faces greater scrutiny in front of the classroom), they were particularly uncomfortable facilitating these PBLs because facilitators are (by design), not subject matter experts in the subject of the particular PBL.

85.     Notably, after Plaintiff's unlawful termination, in or about Fall 2021, Assistant Dean of Diversity Equity and Inclusion, Lynn Hernandez, gave a presentation about the challenges faced

by Black women faculty, including addressing things like the equity and impact of course evaluations.

86.     As Plaintiff had had a positive experience with the medical students, in the M1 and M2 classes, she reached out to the PBL organizer and volunteered for open slots with those students. Plaintiff never received a response and when she followed up again there were no openings.

87.     Defendant Sohler received a report of the dates Plaintiff facilitated PBLs in the Fall.

Plaintiff Was Largely Excluded from Institutional Committees

88.     As a former assistant director of admissions at the University of Vermont, Plaintiff was eager to contribute to the admissions process at the Medical School.  She volunteered to interview prospective students and proceeded to interview three students a week for the duration of the interview period.  Most faculty conducted 2 per week, but Plaintiff enjoyed interviewing and was told in the January 13th Letter that she would be placed on the Admission Committee in the following year.  As Plaintiff was terminated, she never received that committee appointment.

89.     Plaintiff also volunteered for the Staff Search Committee, which was looking to hire a coordinator who would work extensively with Plaintiff.  Ultimately her request was denied, in part because Defendant CUNY admitted it wanted to fill the vacancy with a white committee member.

90.     During Plaintiff's employ, another clinical professor, a white doctoral candidate, who has completed required courses and examinations but has still not defended a dissertation, was invited to chair the Ethics Committee for the Medical School.

91.     While the Department Chair appeared to be the one to designate who should sit on committees, for the duration of Plaintiff's employment, Plaintiff was never placed on a committee or invited to service on one in any capacity.

Plaintiff is Falsely Accused of Sharing Student Health Information

92.     A student in Plaintiff's EHS course had an emergency and reached out to Plaintiff for support. Plaintiff supported the student and reminded the student to report her absences to Student Affairs as soon she was able to.  This was set forth in the January 13th Letter as a failure of Plaintiff to enforce the Medical School's attendance policy and breach of student confidentiality, although Plaintiff revealed no details to Defendant Sohler.

93.     This banal criticism was a pretextual reason for further harassing Plaintiff and no other faculty outside of her protected class was subjected to similar scrutiny.

94.     While Plaintiff could quantify her work and show significant achievement, she was harassed, while no faculty outsider Plaintiff's protected class received any scrutiny whatsoever.

95.     No confidential grade information was shared with faculty outside of the course.  As noted below, assignments were not graded, and grades tabulated until the end of field work.

Defendant Sohler Asks for Community Site Date That She Already Has Access To

96.     In the January 13th Letter, Sohler requested a report outlining the status of the Community Sites – existing sites, discontinued sites, sites newly cultivated by Plaintiff and predictions of any need for additional sites -- and it was provided to her by Plaintiff.  On this report, Plaintiff also shared a link to the Excel spreadsheets, where she maintained in-depth and detailed information about the Community Sites and preceptors.  The data that Plaintiff used to generate the summary she provided to Sohler was available in greater detail within the shared directory, the repository for information for all of the courses taught in the CHASM department and was therefore already fully accessible to Defendant Sohler, before Sohler's request and for the period throughout Plaintiff's employment.  Sohler had asked for the information previously, in or about the Fall 2019, and it was provided by Plaintiff then as well.

97.     Plaintiff also explained that the list of Community Sites would not be considered final until about March of 2020, because things changed at the Community Sites all of the time; for example, someone might retire/resign/change positions/become too busy and then the Medical School has to suddenly secure new opportunities.  Plaintiff explained that March 2020 would be the firm deadline because students would then have to be placed, notified of their placements, and requested to begin a lengthy onboarding process (sometimes as long as 8 weeks, including extensive background checks, medical clearance, and mandatory trainings), before starting the EHS orientation at the end of May 020.

98.     Typically, a Department Chair would not request, because they do not need, the level of minutia that Sohler requested.  No previous faculty in Plaintiff's position, nor any of her peers outside of her protected class were asked for such tedious and redundant reporting.  On information and belief, the onerous request was made merely to harass Plaintiff, manufacture work, make it easier for Sohler take over Plaintiff's professional relationships and otherwise diminish Plaintiff's accomplishments, and to transfer the work away from Plaintiff, which Sohler did only several weeks later.

<u>Plaintiff's Request to Establish a Course Budget is Undermined</u>

99.     Plaintiff had made multiple inquiries regarding establishing a budget for her EHS course and had discussed it with Defendant Sohler in November 2019.  Plaintiff was eager to hire adjuncts and prepare for the upcoming 2020 EHS course.  At that point, Plaintiff was only asking for budget support on a going forward basis, because she knew that there was so much travel through the previous session that was never recorded, because there was no way for Plaintiff to be compensated for it.

100.    In response to Plaintiff's request to establish a budget for the EHS course, in the January 13th Letter, Defendant Sohler made the ridiculous demand that Plaintiff provide a record of her time and travel from the whole prior year.  This followed Plaintiff having previously offered an estimate of travel expenses based on her prior experience, when she prepared her draft course budget and Defendant Sohler's prior acknowledgements of Plaintiff's intense field schedule.

101.    Defendant Sohler's request, while perhaps facially benign, is predicated on her foreknowledge that Plaintiff had absorbed all of her own travel expenses and scheduled her own travel at her convenience, and, without the possibility of reimbursement, could not provide the level of detail of meetings and travel Sohler requested.

102.    This is yet another opportunity taken by Defendants to create a pretext for Plaintiff's disparate treatment and ultimate termination, standard not applied to faculty outside of Plaintiff's protected class. Faculty members who are not members of Plaintiff's protected class, and who Defendant Sohler described as unproductive for years, received no similar requests for information.

Plaintiff Is Given an Artificial Deadline to Revise Her EHS Course Syllabus

103.    In the January 13th Letter, Defendant Sohler requested to receive a revised syllabus from Plaintiff by the following week.  However, Sohler was aware that the Curriculum Committee was supposed to review it first and had not done so.

104.    In August of 2019, Sohler informed Plaintiff that since the EHS course had not been reviewed by the Curriculum Committee since the death of the last full-time course director, five years prior, it would be reviewed at that time.  Sohler went out of her way to mention that the request and the process was not intended to be antagonistic but was designed to be helpful.  Sohler also suggested that Plaintiff prepare Plaintiff's modifications in light of student feedback.

105.    As the 2019 EHS course progressed, Plaintiff had been mortified by some of the Community Sites that she inherited and the lack of support from her coordinator (who had been searching for another position for over a year), and her inherited adjunct professors.  Early in the term, she was also very distracted by students who were dismissed by some of the Community Site placements for misconduct on the part of the students.

106.    Plaintiff realized that she had to dramatically re-vamp the EHS program with additional, new Community Sites, new and/or reinvigorated preceptors, and provide students with a clearer understanding of the goals and objectives of a service-learning experience in the context of the rest of their training, help them to understand clinical empathy and its significance, and introduce better methods of skill development.  Plaintiff also knew that she hoped to completely take over the teaching of the course, and only request the new adjuncts to support with lectures reinforcing research methods.

107.    In Plaintiff's initial report to Sohler, she shared her plans for enhancing the EHS course. Since Plaintiff had not received any substantive guidance with the EHS course nor its role in the overall Medical School curriculum, she welcomed an opportunity to revise her syllabus with input from the larger Medical School community through the Curriculum Committee and in consideration of recent student experiences.

108.    There were numerous attempts by Plaintiff to schedule the meeting with the Curriculum Committee, but each attempt was aborted by Dean Rosa Lee, who chaired the committee.  Finally, she was told that her syllabus would not be reviewed until December 2019, but it was ultimately not reviewed then either.

109.    Nevertheless, Plaintiff submitted a comprehensive syllabus to Defendant Sohler in early 2020 but told Sohler that it was still a work in progress, because Plaintiff was still awaiting the promised feedback from the Curriculum Committee.

110.    The administrator overseeing the submission of syllabi told Plaintiff that as Plaintiff's EHS course did not begin until May 2020, Plaintiff had more time to submit her syllabus.

111.    This stood in sharp contrast to Defendant Sohler's representations to Plaintiff.  In mid-Fall of 2019, Sohler informed Plaintiff that Plaintiff's syllabus and budget (including the hiring of her adjunct professors), were late.  After an extensive search, Plaintiff had identified her adjunct professors by the end of December 2019.  By January 2020, she was working with the CHASM Department administrative specialist for the formal hiring process of the adjunct professors for her EHS course.  Defendant Sohler met the two perspective hires, and requested their contact information and resumes, which were provided to her by Plaintiff immediately.

112.    Despite Plaintiff's clear progress, the indefinite delay by the Curriculum Committee, and the Medical School Administrator advising that Plaintiff's materials were not yet due, Sohler imposed a false deadline to force Plaintiff to scramble to complete non-pressing tasks.  No other faculty outside of Plaintiff's protected class were subject to similar demands.

<u>Plaintiff is Not Observed During Her Course Instruction, Despite Plaintiff's Invitations to Sohler</u>

113.    In the January 13th Letter, Defendant Sohler asked Plaintiff to provide her dates to observe Plaintiff teaching, in compliance with a Medical School annual requirement.  However, not only was Plaintiff's schedule known or knowable to Sohler, but it was also Sohler's own oversight that had prevented her observing Plaintiff during the previous eight months.

114.    In the meeting between Plaintiff and Sohler on or about September 6, 2019, Sohler told Plaintiff that Sohler had forgotten to observe Plaintiff when Plaintiff's EHS class was in session.

Thus, Sohler would have to observe Plaintiff during her facilitation of PBLs. While Plaintiff knew that such a situation was less than ideal, because the learning in PBLs was, by design, largely self-directed and the assigned faculty member is merely a facilitator.  Nevertheless, as requested by Defendant Sohler, Plaintiff provided Sohler with the dates for three opportunities to observe Plaintiff in early October 2020, during her first PBL module that term.

115.    Defendant Sohler confirmed her attendance for one of those dates via email, but then never showed up.

116.    Believing that perhaps Defendant Sohler had been taken away to other matters, or that she may have simply forgotten, Plaintiff wrote to Sohler and said that she would be facilitating again on another date.  However, Plaintiff never heard from Sohler again about observing Plaintiff.

117.    In a meeting in November 2019, when plaintiff was sharing about her January 2020 course pre-orientation, she asked Sohler to save the date because it would give Sohler an opportunity to observe Plaintiff.  Plaintiff believed the invitation was appropriate, as the prior chair attended Plaintiff's previous orientation, even contributing.

118.    Given the voluminous disingenuous and inaccurate statements by Defendant Sohler in the January 13th Letter, Plaintiff responded by immediately making a complaint to Defendant Friedman and the Assistant Dean of Diversity, Equity and Inclusion, both of whom had already been long been aware that Plaintiff was being subjected to harassing and disparate treatment by Defendant Sohler and Defendant McBeth.

119.    After repeated requests by Plaintiff to meet with Defendant Friedman, she met with Plaintiff in or about December 2019.  Although the requested purpose of the meeting was to discuss Plaintiff's concerns about Defendants Sohler and McBeth, Defendant Friedman merely advised Plaintiff to "just overlook Dani's [McBeth's] Irish temper," and discussed nothing further.

120.   On information and belief, at least one other member of Plaintiff's protected class made similar complaints to Defendant Friedman and Defendant Sohler, and Friedman took no action in that instance either.

121.   Subsequently, Plaintiff again met with Assistant Dean of Diversity, Equity and Inclusion and Chief Diversity Officer, among others, to report these most recent concerns.

122.   At that time, Plaintiff did not take additional steps to pursue her complaints within CUNY, because she feared further reprisal.

123.   Her concerns were not unfounded.  Each of her prior complaints, which Defendants were all aware of, were followed by escalating mistreatment.

124.   Further in or about the Fall of 2019, Plaintiff become aware of another department head and senior executive in the Medical School, who had publicly berated staff members for not giving positive feedback on their experiences in the department, and retaliated against them, after representations about confidentiality in complaints of discrimination and a racially hostile work environment were dishonored.

Plaintiff Receives a Poor Annual Review Rife With False Claims

125.   On or about March 3, 2020, Plaintiff was emailed a poor Annual Review written by Defendant Sohler (the "Annual Review"), which failed to acknowledge any of Plaintiff's accomplishments, made disingenuous accusations about purported shortcomings and recited knowingly false allegations about Plaintiff's performance, largely echoing the January 13th Letter.

126.   The Annual Review restated Defendant Sohler's purported need for detailed information in Community Sites and claimed that Sohler did not have a final list of Community Sites or information on their status.  Defendant Sohler deliberately and conspicuously omitted that she had

full access to all available data regarding Community Sites, and full knowledge that the existing information could not be deemed final until March 2020.

127.   Defendant Sohler failed to acknowledge the work that Plaintiff had done to secure a substantial number of new Community Sites to accommodate a record number of student placements in the EHS course. Sohler feigned ignorance of the problems with the withdrawing Community Site, despite being well aware of the problem of CUNY students being dismissed for bullying other students at that site, implying that Plaintiff had not disclosed what had occurred.

128.   Defendant Sohler reported that Plaintiff was only working 32 hours of PBL work. Of course, Sohler did not include that several other faculty members worked substantially less, including some working none at all. None of these faculty members outside of Plaintiff's protected class received similar criticism.

129.   Defendant Sohler stated that she had not received a final syllabus from Plaintiff, failing entirely to disclose that she had received a revised syllabus, the Medical School had advised that the syllabus was not yet due for Plaintiff's EHS course, and that it was subject to review by the Curriculum Committee, who as of the February writing of the Annual Review, had not reviewed Plaintiff's syllabus.

130.   Although Defendant Sohler had told Plaintiff in November 2019, that the student AP, who had been dismissed from her placement and not re-placed, had 'been taken care of' and was given a passing grade, rather than the incomplete given by Plaintiff, on Plaintiff's Annual Review, Sohler masks this covert undermining of Plaintiff by referring to AP's grade as "incomplete".

131.   Perhaps most gratuitously pretextual of all, Defendant Sohler reiterated six fabricated failures attributed to Plaintiff in the January 13th Letter: late grades, failure to use professionalism form for student dismissals, multiple mistreatment forms filed, mid-course feedback not given,

attendance and confidentiality.  The parenthetical feedback offered after each remark constitutes a suggestion to include notes on Plaintiff's syllabus relevant to five of the items, and a recommendation to "consider scheduling regular meetings with class reps or other intervention") to address the specious mistreatment reports.

132.    After Sohler forgot to evaluate Plaintiff during Plaintiff's EHS course, and then failed to show up to scheduled alternative date, Defendant falsely state that Plaintiff had failed to give Sohler dates to observe Plaintiff, and therefore she could not evaluate Plaintiff's performance, when she finally came to observe Plaintiff for about an hour in January 2020.

133.    For the first time in the Annual Review, Defendant Sohler criticized Plaintiff for not publishing papers, nor procuring any grants.  While, tenure-track faculty routinely pursue grants and are published, clinical professors do not.  The criticism by Sohler held Plaintiff to a different standard based on her race, as other clinical faculty, who are not members of Plaintiff's protected class, were not asked to write grants or publish papers (and did not do so).

134.    Sohler curiously describes the EHS course as a 6-week course commitment for a full-time clinical professor, failing to mention that the course is 8 weeks, and included for Plaintiff, not just class instruction, Community Site supervision, securing, cultivating and training 50 new field site opportunities, re-orienting preceptors that were maintained.   As Sohler had previously acknowledged, Plaintiff spent most of every day out in the field, and then worked into the evening most days of the week.  Defendant Sohler deliberately omitted this from her evaluation of Plaintiff to obfuscate Plaintiff's accomplishments.

135.    Similarly, Defendant Sohler credited Plaintiff with merely helping an Associate Dean facilitate a program at the Medical School, when in fact, the featured speaker, the former head of the NYC Health and Hospitals Corp., was a professional acquaintance of Plaintiff and had come

at her sole invitation.  The details of the program were omitted to mask the accomplishments of Plaintiff and Sohler instead gave primary credit for the event to a faculty member who is white and who did not meaningfully participate in creating or facilitating the program.

136.    Defendant Sohler recites that Plaintiff was denied funding for a professional development opportunity, then, falsely alleges that Plaintiff had no professional development, when in fact Plaintiff went to the program at her own expense.

137.    Sohler concludes her Annual Review of Plaintiff, by falsely asserting that she has received no documentation about what Plaintiff was working on, implies that Plaintiff had been disingenuous about her representations regarding how Plaintiff spent her professional time and that Plaintiff had ignored corrective feedback, including Sohler's untrue January 13th Letter.

138.    Plaintiff alleges that the Annual Review was a pretextual exercise, calculated to mask the disparate treatment that Plaintiff received because of her race and in retaliation for her numerous complaints about the hostile work environment in which she had labored.

### Following Her False Review, Plaintiff Was Denied Re-appointment

139.    On or about March 12, 2020, in a letter emailed and hand delivered to Plaintiff, the Executive Faculty Committee -- which on information and belief was all white, and included no Black members, and on further information and belief, included Defendant Sohler -- denied Plaintiff reappointment, terminating her employment effective on or about August 26, 2020.

140.    While Defendants terminated Plaintiff, Defendant CUNY, its Medical School, and the CHASM Department in particular, included faculty, who are not members of Plaintiff's protected class, but who, on information and belief, received lower course evaluations than Plaintiff for, received student complaints, submitted grades late, did not publish any papers or engage in other activities, the absence of which was used to justify penalizing Plaintiff.  These other faculty

members were not subjected to the disparate treatment Plaintiff received.  Rather they were left to their own devices to teach their course as they saw fit, with no attempt to undermine their standing as faculty or to hijack their professional relationships in the community.

141.    Days later, on March 19, 2020, via an email letter, Plaintiff was demoted and assigned administrative tasks to further demean and humiliate her in her terminal six months.

142.    Defendant Sohler took over organizational relationships that Plaintiff cultivated to be used by others, although Defendants had previously contended that these relationships were inadequate to satisfy Plaintiff's job duties.

143.    The course of Plaintiff's treatment by Defendants -- professional isolation, a lack of professional support, microaggressive behaviors by superiors, open chastisement in front of students and then rewarding students who were abusive towards Plaintiff, giving credence to knowingly erroneous reports of alleged misconduct by Plaintiff, asking her to volunteer to facilitate a course, where some of the students had made racist comments about Plaintiff – are examples of a larger, systemic pattern of racism and the fostering of a hostile work environment on the basis of Plaintiff's race.

144.    This pattern includes, for example, the hostile work environment and retaliation that Plaintiff learned of in another department in the Medical School, as described *supra*.

145.    As another example, Plaintiff learned in the Spring 2020, a Black woman and highly qualified candidate, Dr. Sirry Alang, was invited to give a talk as part of the consideration of CUNY offering her a senior faculty position.  She gave a job talk "Experiences of Racism as Related to Utilization of Health Services" and she also asked Friedman about the climate for Black academics at the Medical School.  After her presentation, the CHASM department unanimously recommended Dr. Alang for the senior faculty role.

146.    However, behind closed doors, the search committee, which was made up entirely of non-Black members, considered Dr. Alang "too militant" because of the topic of her talk and her direct questioning of Defendant Friedman regarding the treatment of Black faculty.   Another, white candidate who also talked about health disparities, was not considered militant by the committee. While the position was ultimately, offered to a person of color, the bias expressed against Dr. Alang, as not 'the right type of Black person', reflects the continued and insidious condition of a hostile work environment by Defendants based on race, and the adverse consequences for people in Plaintiff's protected class, who openly opposed to it.

## FIRST CLAIM FOR RELIEF

### [*as against CUNY*]

### [Race, Color, Perceived National Origin, Sex/Gender Expression and Perceived Sexual Orientation Discrimination in Violation of Title VII]

147.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

148.    Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under Title VII based on her race.

149.    CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Miller-Sethi on the basis of her race.

150.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

151.    CUNY knew that its actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutory rights.

152.    As a direct and proximate result of CUNY's conduct in violation of Title VII, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings

and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

153.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SECOND CLAIM FOR RELIEF

### [*as against CUNY*]

### [Hostile Work Environment Based on Race in Violation of Title VII]

154.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

155.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY.

156.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, in violation of Title VII.

157.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical

illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

158.     CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### THIRD CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title VII]

159.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

160.     Pursuant to the acts and practices of CUNY as alleged above, Plaintiff complained to CUNY's HR staff, of the discrimination based on her race, and thus, was engaging in a protected activity pursuant to Title VII.

161.     CUNY knew or should have known of the unlawful acts and practices as the same, yet failed to act promptly to prevent or end the harassment and discrimination, and instead knowingly permitted it to continue in retaliation for Plaintiff opposing discriminatory behavior.

162.     Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that she suffered and the hostile work environment that was created thereby. CUNY, then refused to re-appoint Plaintiff, demoted her and subjected her to an antagonistic and inhospitable work assignment as retaliation for making internal complaints about discrimination, in violation of Title VII.

163.     As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

164.     CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FOURTH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Discrimination Based on Race in Violation of Title VI]

165.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

166.     Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under Title VI based on her race.

167.     On information and belief, and at all times relevant hereto, CUNY received, and continues to receive, federal financial assistance.

168.     CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Miller-Sethi on the basis of her race.

169.     The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

170.     CUNY knew that its actions constituted unlawful discrimination, showed deliberate indifference and/or reckless disregard for Plaintiff's statutory rights.

171.    As a direct and proximate result of CUNY's conduct in violation of Title VI, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

172.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FIFTH CLAIM FOR RELIEF

**[Hostile Work Environment Based on Race in Violation of Title VI]**

173.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

174.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY.

175.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, showing deliberate indifference and/or reckless disregard for Plaintiff's statutory rights, in violation of Title VI.

176.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages

for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

177.   CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

**SIXTH CLAIM FOR RELIEF**

**[*as against CUNY*]**

**[Retaliation in Violation of Title VI]**

178.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

179.   Pursuant to the acts and practices of Defendant as alleged above, Plaintiff made complaints Defendant's HR staff of the discrimination based on her race, and thus, was engaging in a protected activity pursuant to Title VI.

180.   CUNY knew or should have known of the unlawful acts and practices yet acted with deliberate indifference and/or reckless disregard for Plaintiff's rights, and failed to act promptly to prevent or end the harassment and discrimination CUNY.

181.   Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that she suffered and the hostile work environment that was created thereby. CUNY, then refused to re-appoint Plaintiff, demoted her and subjected her to an antagonistic and inhospitable work assignment as retaliation for making internal complaints about discrimination, in violation of Title VI.

182.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

183.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**[*as against the Individual Defendants in their individual capacities*]**

**[Discrimination Based on Race in Violation of Section 1981]**

184.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

185.    The Individual Defendants, in their individual capacities, discriminated against Miller-Sethi on the basis of her race, thus depriving Miller-Sethi of rights, privileges, and other beneficial terms of her employment, in violation of Section 1981.

186.    As a direct and proximate result of Individual Defendants' discriminatory conduct described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

187.     The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### EIGHTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Hostile Work Environment Based Race in Violation of Section 1981]**

188.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

189.     By the discriminatory acts and practices of the Individual Defendants in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY.

190.     As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

191.     The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## NINTH CLAIM FOR RELIEF

**[*as against the Individual Defendants, in their individual capacities*]**

**[Retaliation in Violation of Section 1981]**

192.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

193.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff for her opposition to conduct that violated her rights and privileges in her employment in violation of Section 1981.

194.    As a proximate result of the Individual Defendants' retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

195.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## TENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Discrimination Based on Race in Violation of Section 1983]**

196.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

197.    The Individual Defendants, in their individual capacities, acting under color of law, custom or usage, discriminated against Miller-Sethi on the basis of her race, thus depriving her of her rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

198.    As a direct and proximate result of Individual Defendants' discriminatory acts described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

199.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## ELEVENTH CLAIM FOR RELIEF

**[a as against the Individual Defendants, in their individual capacities]**

**[Hostile Work Environment in Violation of Section 1983]**

200.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

201.    By the discriminatory acts and practices of the Individual Defendants acting under color of law, custom or usage, in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her

employment with CUNY, depriving Miller-Sethi of rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

202.    As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

203.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

**TWELFTH CLAIM FOR RELIEF**

**[*as against the Individual Defendants, in their individual capacities*]**

**[Retaliation in Violation of Section 1983]**

204.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

205.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, under color of law custom or usage, have retaliated against plaintiff for her opposition to conduct that violated her rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

206.    As a proximate result of the Individual Defendants' retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and

compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

207.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### THIRTEENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Discrimination based on Race in Violation of Executive Law]**

208.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

209.    The Plaintiff is Black woman of African-American descent and is thus a member of a protected class under the Executive Law based on her race.

210.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the Executive Law, by taking adverse action against Plaintiff directly because of her race and aided and abetted CUNY in discriminating against Plaintiff.

211.    As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the Executive Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting

embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## FOURTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Hostile Work Environment Based on Race in Violation of the Executive Law]

212.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

213.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to, and aided and abetted CUNY in subjecting Plaintiff to, a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter the conditions of her work environment during her employment with CUNY, in violation of the Executive Law.

214.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## FIFTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Retaliation in Violation of Executive Law]

215.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

216.     By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of her employment, including by creating a hostile work environment and aided and abetted CUNY in its retaliation against Miller-Sethi for her protected activity, in violation of the Executive Law.

217.     As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

### SIXTEENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Discrimination Based on Race in Violation of the City Law]**

218.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

219.     Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under the City Law based on her race.

220.     By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the City Law, by taking adverse action against Plaintiff directly because of her race and aided and abetted CUNY in discriminating against Plaintiff.

221.     As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the City Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial

losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

222.    The Individual Defendants' unlawful conduct amounts to either willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## SEVENTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Hostile Work Environment Based on Race in Violation of the City Law]

223.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

224.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to, and aided and abetted CUNY in subjecting Plaintiff to, a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter the conditions of her work environment during her employment with CUNY, in violation of the City Law.

225.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss

of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

226.    Defendant's conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

<u>EIGHTEENTH CLAIM FOR RELIEF</u>

[*as against the Individual Defendants in their individual capacities*]

[**Retaliation in Violation of the City Law**]

227.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

228.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of her employment, including by creating a hostile work environment and aided and abetted CUNY in its retaliation against Miller-Sethi for her protected activity, in violation of the City Law.

229.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

230.    The Individual Defendants' conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount

to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectively request that this Court enter a judgment providing the following relief:

a)       A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, State of New York and the City of New York;

b)       An injunction and order permanently restraining Defendants, their partners, officers, owners, agents, successors, heirs, employees, assigns and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c)       Directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment, including restoring positions and duties to Plaintiff that have been taken away;

d)       An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, and other benefits of employment;

e)       An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, physical illness, emotional pain and suffering, and emotional distress;

f)      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, lost income, reputational harm, and harm to professional reputation, in an amount to be determined at trial;

g)      An award of punitive damages in an amount to be determined at trial;

h)      Liquidated damages in an amount to be determined at trial;

i)      Prejudgment interest on all amounts due;

j)      An award of costs that Plaintiff has incurred in this action, including, but not limited costs of expert witnesses and reasonable attorneys' fees and costs to the fullest extent permitted by law; and

k)      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.


Dated: Dated:  October 18, 2021
        New York, New York

                                        JASPER & JASPER, PLLC


                                        BY: /s/ Zoë E. Jasper
                                            Zoë E. Jasper
                                            zoe@jasperpllc.com
                                        17 State Street; Suite 4000
                                        New York, New York 10004

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF   *New York*   )

    FAITH MILLER-SETHI, being duly sworn, depose and say: I am the Plaintiff in the

within action; I have read the foregoing Verified Complaint and know the contents thereof; the

same is true to my own knowledge, except as to the matters therein stated to be alleged on

information and belief, and as to those matters I believe them to be true.

                          _Faith Miller-Sethi_

                            FAITH MILLER-SETHI

Sworn to before me this
day of   *October  19*   , 2021

_____
Notary Public

JIMMY MA
Notary Public, State of New York
No. 01MA0118017
Qualified in New York County
Commission Expires Sept. 20, 2024