UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

FAITH MILLER-SETHI,

                             Plaintiff,

- against -

CITY UNIVERSITY OF NEW YORK, DANI
MCBETH, NANCY SOHLER and ERICA
FRIEDMAN

                             Defendants.
--------------------------------------------------------X

**Case No. 21-cv-8591**

**VERIFIED AMENDED COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

    Plaintiff Faith Miller-Sethi ("Miller-Sethi" or "Plaintiff"), by her attorneys, Jasper &

Jasper, PLLC, complaining of City University of New York ("CUNY"), Dani McBeth and Nancy

Sohler and Erica Friedman (collectively "Individual Defendants", collectively with CUNY

"Defendants"), alleges:

## NATURE OF CLAIMS

1.    Miller-Sethi was subjected to unlawful discrimination, a hostile work environment and

retaliation in response to her internal complaints of discriminatory treatment in her employment

with City University of New York School of Medicine (the "Medical School"), a member

institution of the CUNY university system of the City of New York, based on her race.

2.    Miller-Sethi is a Black woman of African-American descent.  She was hired as Clinical

Professor/Course Director for the Evaluation in Healthcare Settings course on or about January 9,

2019 and worked in the position for the Medical School, until she was unlawfully terminated on

the pretext of ministerial violations of administrative policy on or about August 26, 2020, when

she was terminated for the discriminatory reason of her race  and in retaliation for the protected

activity of complaining of discriminatory treatment and a racially hostile environment in her employment.

3.      Miller-Sethi was supervised and treated differently than other employees with similar job duties and responsibilities.  She suffered physical, emotional, economic and reputational damage as a result of the deliberately racially inhospitable and unwelcoming environment, including termination for complaining of the same.

4.      This proceeding is brought to remedy discrimination against Miller-Sethi by Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-d, *et seq.* ("Title VI"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the New York State Human Rights Law, Executive Law§ 290, *et seq.* (the "Executive Law"); and the New York City Administrative Code, § 8-101, *et seq.* (the "City Law").

5.      Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated, and punitive damages, and other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the claims herein arise under federal law.  The Court has supplemental jurisdiction over the claims brought under the Executive Law and the City Law, pursuant to 28 U.S.C. §§ 1367, as the remaining claims are so related that they form a part of the same case or controversy.

7.      On or about December 20, 2020, Plaintiff filed a charge of discrimination against CUNY with the United States Equal Opportunity Employment Commission (the "EEOC").  Pursuant to a work sharing agreement, a copy was also filed with the New York State Division of Human Rights.

8.      On or about July 22, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.  A true copy is annexed hereto as Exhibit A.

9.      Accordingly, Plaintiff's complaint herein has satisfied all administrative conditions and is timely.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York, and the parties are located within the Southern District of New York.

## PARTIES

11.     Dr. Faith Miller-Sethi is a natural person living in the State and County of New York.

12.     Miller-Sethi is a member of a protected class, as Black, African-American woman.

13.     Plaintiff is a Doctor of Public Health, Sociomedical Sciences, conferred from Columbia University School of Public Health.  She also holds an MPH, Population and Family Health from Columbia University, and a BA from Duke University.

14.     Dr. Miller-Sethi has worked in the sector of public health for approximately 25 years.  She is possessed with an understanding of the social determinants of health stemming from deep knowledge of the social and behavioral sciences and a diverse public health work history, including experience conducting community research, designing and implementing evidence-based programs in community settings, teaching about them within an academic medicine curriculum and leading a community development organization within a hospital.

15.     Defendant CUNY is a publicly funded university system, comprised of senior and community colleges, graduate and professional schools, research centers, institutes, and consortia. Its headquarters and principal place of business is New York, New York.  Upon information and belief, at all times relevant hereto CUNY received and continues to receive federal financial

assistance for its programs and its discriminatory employment practices negatively affect the delivery of services to its students, faculty, people serviced by its community-based programs, and other program beneficiaries

16.     According to a statement published by CUNY in January 2019, the Medical School, located at the City College campus of CUNY, led the nation in diverse enrollment of students, with a majority of the students in the CUNY School of Medicine – 53 percent – being members of underrepresented minority groups, ;  almost the reverse of the nation's medical schools as a whole, which reportedly remained 59 percent white.

17.     The difference of the Medical School's enrollment is most striking in the number of Black students, who accounted for 35 percent of the medical students – five times the national percentage, according to data CUNY sited from the Association of American Medical Colleges.

18.     The Medical School's purpose and goals are informed by its unique social mission of improving health care in underserved communities at a time when the need for primary care physicians is rising nationwide.

19.     Defendant Dani McBeth is now and at all times relevant to the allegations herein, the Associate Dean of Student Affairs for the Medical School.  At all times relevant to the allegations herein, Defendant McBeth had authority to influence the position and professional responsibilities of Plaintiff, including her job duties, retention and termination.

20.     Defendant Nancy Sohler is an Associate Medical Professor at the Medical School, and all times relevant to the allegations herein was the Interim Department Chair of the Community Health and Social Medicine Department ("CHASM"), of the Medical School.  At all times relevant to the allegations herein, Defendant Sohler had supervisory authority over all the members of CHASM, who were in all relevant material respects similarly situated in requirements of

professional conduct and performance to Plaintiff.  At all times relevant to the allegations herein, Defendant Sohler had authority to influence the position and professional responsibilities of Plaintiff, including her job duties, retention and termination.

21.     Erica Friedman was appointed as Interim Dean of the Medical School in or about February 2019 and held that position at and all times relevant to the allegations herein.  At all times relevant to the allegations herein, Defendant Friedman had supervisory authority over Plaintiff and all of the faculty of the Medical School, who were in all relevant material respects similarly situated in requirements of professional conduct, and performance to Plaintiff.  At all times relevant to the allegations herein, Defendant Friedman had authority to influence the position and professional responsibilities of Plaintiff, including her job duties, retention and termination.

## **FACTUAL ALLEGATIONS**

22.     Since on or about June 1, 2019, when Defendant Sohler assumed responsibility as the Interim Chair of the CHASM Department of the Medical School, until Plaintiff's unlawful termination in August 2020, Plaintiff was subjected to intentional discrimination, disparate treatment, excessive scrutiny and harassment, based on her race.

23.     The Medical School has an intensive three-year sequence of courses in Community Health and Social Medicine offered through a like-named CHASM Department, which includes field placements in community medicine, in partnership with community-based health centers and health-related programs in underserved areas of New York City ("Community Sites").  Evaluation in Healthcare Settings ("EHS"), is a required course within the CHASM department.

24.     Plaintiff began her employment with CUNY on or about January 9, 2019, when she was appointed as a Clinical Professor to serve as Course Director for EHS.  On information and belief, Plaintiff was the first Black Course Director for EHS.

25.     Chief among Plaintiff's responsibilities was to build and maintain relationships with Community Sites, supervise student placements at the Community Sites, and teaching the EHS course.

26.     Plaintiff's initial appointment was for the period from January 9, 2019, through August 26, 2019, with the prospect of renewals up to a total of seven years.  This position did not offer the possibility of tenure.

### Plaintiff Is Subjected to Discriminatory Treatment and a Lack of Professional Support

27.     While the EHS course was normally prepared by the Course Director a year in advance, then-CHASM Department Chair Dr. Joan Dorn was anxious for the course to start and directed Plaintiff to roll out the course as-is based on the historical parameters for the course.  Plaintiff began the pre-orientation of students in January 2019, a few weeks after she ware hired.

28.     Plaintiff was eager to embrace the opportunity to share her experience in public health and help students to understand how social determinants of health manifest in the lives of their patients with an overarching goal of fostering clinical empathy -- a critical component of the practice of medicine, where medical mistrust is high among historically underserved communities.  She looked forward to the professional satisfaction she would derive from being part of an institution that made education of racially and ethnically underrepresented students in medicine a priority, at an institution that also charged itself with the unique mission of developing medical resources for underserved communities, which suffered a lack of doctors generally, and a lack of culturally competent and racially diverse doctors as well.

29.     Notwithstanding the impossibly short schedule, in only a few months, Plaintiff, faced with record enrollment for the EHS course, had secured several additional Community Sites, growing the roster by approximately 25%, which she reported to Dr. Dorn.

30.     Plaintiff was completely self-directed in the relationship-building and Community Site procurement process.  Her work was conducted all over the five boroughs of New York City and Long Island.  Dr. Dorn expressed pride in Plaintiff's work and that she felt that Plaintiff was having a great deal of success in Plaintiff's new role.  By contrast, in or about the Fall of 2019, Defendant Friedman reported to Plaintiff that Friedman had scheduled a meeting with the head of Metropolitan Hospital, in part to secure it as a Community Site.  Defendant Friedman told Plaintiff that she was embarrassed that Plaintiff had already been there and established a Community Site relationship.

31.     Plaintiff repeatedly asked for a way to cover her travel expenses (sometimes, $50/day).  For the duration of her time at the Medical School, all of the expenses attendant to her work, were paid out of Plaintiff's own pocket.  Later, at a November 2019 faculty meeting, Plaintiff again made the request for expense support and was informed that there would be a process to facilitate her reimbursement, which never materialized.

32.     From early on, as a means of supporting Plaintiff's transition to her position at the Medical School and her work with students, Plaintiff and Dr. Dorn met periodically.  Plaintiff volunteered updates to Dr. Dorn on her progress with developing the course each week.  These weekly check-ins were not mandated, nor were they in Plaintiff's job description, but rather were offered by Dorn to support Plaintiff.

33.     Despite their mostly successful working relationship, Dorn never provided Plaintiff with any substantive guidance for Plaintiff's EHS course within the context of the Medical School curriculum, never introduced Plaintiff to any other members of the faculty or staff, nor involved Plaintiff in any other aspects of the school community.

34.     Prior to Defendant Sohler acting as Interim Chair of CHASM, Plaintiff had had almost no interaction with Defendant Sohler.  During these initial months in Plaintiff's position, in or about May 2019, Defendant Sohler, attended only one regular department meeting and one other mandatory meeting with the mediator and these were the only interactions that Plaintiff had with Defendant Sohler.

35.     Plaintiff was assigned an administrative coordinator, Michele Maher, argued over including Plaintiff's full name and credentials being included on Plaintiff's name plate.  She would responsibly respond to the other professor that she worked for, a white woman, but fail or refuse to perform work for Plaintiff.  Such inequitable treatment and lack of support for Plaintiff, as compared to similarly situated white colleagues, proved to be normative.

Defendant Sohler Becomes Interim Chair of CHASM

36.     When Plaintiff was hired, Defendant Sohler had never met Plaintiff.  Defendant Sohler did welcome Plaintiff by saying that she had many PhD friends that wanted Plaintiff's job, but that Plaintiff was perfect for her role.

37.     At the time that she became Interim Chair of the CHASM Department, Defendant Sohler had not been speaking to Plaintiff for several months and thereafter met with Plaintiff only a few times

38.     Defendant Sohler routinely sent emails to Plaintiff asking for ministerial items, which had no urgency, to be completed by the close of business or otherwise on short notice, while not doing the same to other faculty, who were not members of Plaintiff's protected class.  Because of her race, Plaintiff was not afforded the normal and expected autonomy inherent in any faculty position.

39.     Plaintiff was the only person in her department being so intensively scrutinized, all while she was successfully developing relationships that would benefit Defendant CUNY for years to come.

The Fact of Plaintiff's Re-appointment is Deliberately Withheld from Plaintiff

40.     In or about August 2019, Sohler, told Plaintiff that mistreatment claims made against Plaintiff in the Spring of 2019 – allegations, which Sohler knew were spurious as outlined *infra* - - might mean that Plaintiff would not be re-appointed.  Since Plaintiff was hearing feedback about this for the first time, and her initial appointment ended August 26, 2019, Plaintiff panicked and tried to track down information about her reappointment status.  Plaintiff had never received any written communication about any continuing appointment.

41.     Late, on the Friday evening before the August 26, 2019, expiry of her then-current appointment, Plaintiff received a return call from Cornell Clarke of CUNY Human Resources telling Plaintiff that that she had been re-appointed and should have received notification months earlier.  He assured Plaintiff that she was not being discharged because of the false student evaluations, as discussed *infra*.

42.     Plaintiff was surprised to learn, on information and belief, that Defendant Sohler sat on the Executive Faculty Committee, which makes reappointment determinations, and thus Sohler was aware, six months before her remarks to Plaintiff that her re-appointment was in jeopardy in August 2019, that Plaintiff had already been re-appointed for the following year.

43.     Rather, Sohler deliberately wanted to cause Plaintiff distress.  It was not until the Spring of 2020, that Plaintiff obtained her reappointment letter from the prior year and only upon her request from the human resources department of the Medical School.

44.     On information and belief, no other faculty member outside of Plaintiff's protected class, was subjected to this sort of harassment and wonton distress caused to Plaintiff by Sohler.

45.     As known to Sohler and determined in March of 2019, Plaintiff was re-appointed to her same title for the period beginning August 27, 2019 and ending August 26, 2020.

46.     Between Defendant Sohler's appointment as Interim CHASM Chair in or about May 2019, and January 2020, Sohler and Plaintiff met only a few times: on or about August 22, 2019, September 6, 2019, in or about November 2019 and January 9, 2020.

47.     In their August meeting, Defendant Sohler acknowledged that demand of Plaintiff coordinating 86 Community Site placements required Plaintiff to spend most of her time in the field.  Sohler recommended that a grader be hired for the following year and as well as different adjunct professors to help with field site evaluations for the EHS course.

48.     A few days after their last meeting in January 2020, by letter dated January 13, 2020, Defendant Sohler wrote Plaintiff a purported summary of their most-recent January 9, 2020, meeting (the "January 13th Letter").  Not only was the summary inaccurate of the content of the meeting, but it was a knowingly false recitation of several accusations leveled at Plaintiff.  On information and belief, no other faculty member outside of Plaintiff's protected class received similar, false and accusatory feedback.  Rather Plaintiff was targeted based on her complaints regarding racial hostility in the workplace.  To Plaintiff's shock, the January 13th Letter was littered with misrepresentations and falsehoods, some of which are described *infra*.

Plaintiff is Falsely Accused of Submitting Grades Late

49.     Sohler agreed Plaintiff's course grades would be due on Friday, August 9, 2019.  Since the relevant CUNY office was scheduled to be closed that day, it directed Plaintiff to submit her grades on the following Monday, August 12, 2019, which Plaintiff did. However, in the January 13th

Letter, Defendant Sohler falsely represented that Plaintiff had submitted her grades late. In support of her contention that the grades were late, Sohler referenced a policy purported grades for non-clinical course should be submitted within one week of the end the course. However, the Medical School describes Plaintiff's EHS course as a clinical encounter, where students experience "acting as part of a clinical team".

50.     Sohler had previously complained the grades for Plaintiff's course were 'always submitted late'. This is a disingenuous criticism of Plaintiff, as others, and not Plaintiff, had previously taught the course. Sohler was attempting to hold Plaintiff accountable for something allegedly done by Plaintiff's white predecessors.

51.     On or about July 22, 2019, Sohler informed Plaintiff, for the first time, that final grades needed to be submitted by August 3, 2019. Plaintiff's clinical course, which ran eight weeks over the Spring and Summer, would not conclude until July 26, 2019, when final papers were due from students. What is more, the building was closed the following day, and adjunct professors would not receive the final 20-page student papers for grading until on or about July 29, 2019.

52.     Sohler claimed Plaintiff's course was a Spring term course, the grades were already overdue, and had to be submitted by the August 3rd deadline, notwithstanding that the course ran through July and is listed by the Medical School on its 2019 curriculum map as a summer course.

53.     Plaintiff ultimately turned all of the grades around in or about a weeks' time.

54.     In tandem with the specious accusation of lateness, Defendant requested that Plaintiff include the due dates for student assignments in Plaintiff's syllabus. Plaintiff had done so prior to teaching the course the first time and, had she not been wrongfully terminated, would have done so in the future sessions.

55.     In a further attempt to escalate the non-problem of Plaintiff's grade submissions, Sohler informed Plaintiff that Defendant Friedman was demanding the grades as soon as possible because Friedman wanted to know if any student was failing or getting an incomplete in Plaintiff's course. Although Plaintiff was in the midst of reviewing the grades, in advance of the August 9th submission deadline, Plaintiff was able to convey the overall status of the class and reported to Sohler that all of the grades were above the B-range and that two students were getting incompletes: a student dismissed for disciplinary reasons and other student with an apparent medical absence.

Plaintiff is Wrongly Accused of Improper Handling of Dismissed Student

56.     On or about June 4, 2019, a preceptor (a Community Site contact/supervisor), wrote to Plaintiff informing her that a student (named herein as "AP"), would not be allowed to perform AP's field work at her Community Site.  Despite being dismissed during the onboarding process, AP attempted to return to the site.  The preceptor at the Community Site reported to Plaintiff that she considered AP to be dishonest, deceitful, entitled and condescending, and for these reasons, was unwilling to work with AP.  She stated that the student was not permitted on the premises of her facility; a point conveyed to AP directly by the Community Site manager.  This preceptor, the director of a nursing facility (an EHS training site since its inception, over 30 years ago), and a 20-year veteran of the EHS course, stated that AP was unlike any CUNY student she had ever worked with.  She stated that she knew that CUNY faculty were very committed, and she reported that she was offended by what AP stated and inferred about Plaintiff.

57.     Plaintiff had previously tried to find AP an alternate placement.  All students were queried regarding their summer-time residence and AP had confirmed that she would residing on or near the campus of the Medical School, in Hamilton Heights, in Manhattan, in order to avail herself of

the opportunity to be a volunteer at Mt Sinai medical Center in that area; she had no plans to live near her family home in Long Island.

58.     AP had been offered a placement in the Bronx, adjacent to the New York Botanical Gardens, near Fordham University, which AP refused stating that she was not comfortable working in that area (she also indicated her discomfort traveling to the Medical School).  On information and belief, notwithstanding that the purpose of the program was to engage in underserved communities, AP was disruptive in the onboarding process at her failed placement and refused the offered alternative, because she was openly hostile to the racial makeup of the communities targeted by the EHS program.

59.     Since another student had withdrawn from the course leaving a placement available in Staten Island, Plaintiff offered that placement to AP as an alternative.  Plaintiff described the placement's area as similar to Long Island, where AP was from.  AP declined.  Instead, she surreptitiously attempted to create a placement in Long Island, without Plaintiff's authorization, and too late to proceed through the 6-week occupational health requirements in time to start the course, the Medical Director at the site informed AP that she would not be permitted to take a placement.

60.     Without a new placement following the original preceptor's demand that AP leave the premises, AP went to Defendant McBeth to complaint about her placement and Plaintiff. Defendant, who responded by calling Plaintiff and Defendant Sohler to his office, with AP.

61.     In front of the student AP and Defendant Sohler, Defendant McBeth scolded Plaintiff and criticized Plaintiff for AP's failed placement.  In discussing the course of the options that had been made available to AP, Defendant McBeth chided Plaintiff, "you don't know Long Island," assuming, without basis, in his microaggression that Plaintiff was unfamiliar with the community

environment and standard of living of a Long Island suburb, where AP was from, or why AP might wish to decline working in the potential placements offered and tried (improperly) to create a placement in Long Island.  Not only was such a tongue lashing unprofessional, but on information and belief, it was motivated by racial animus and biased assumptions about Plaintiff's community experiences because of her race, and improperly gave deference to the discriminatory position of AP

62.     Prior to this interaction, Plaintiff had never been introduced to or met Defendant McBeth. Nor was she familiar with his apparent role in the process of a new placement for a student who had been summarily dismissed for cause from her previous placement.  On information and belief, Defendant McBeth did not intervene to circumvent any other Course Directors of the EHS course, aside from Plaintiff.

63.     As they left the meeting Plaintiff told Defendant Sohler that Plaintiff was upset by Defendant McBeth's statements and believed that his treatment of Plaintiff was improper, abusive, and racially motivated.  Sohler responded by telling Plaintiff that Sohler would report the incident to the human resources department, which later followed up with Plaintiff.

64.     Although the January 13th Letter falsely asserts that Plaintiff did not file a professionalism form nor inform appropriate administrators, following AP's dismissal for cause, Plaintiff submitted an extensive professionalism form (a form forwarded to Plaintiff by Defendant Sohler), to Defendant McBeth.  Defendant McBeth failed to act on it.  Several weeks later, when Plaintiff inquired about the status her submission to Defendant McBeth, Plaintiff was told that Plaintiff had submitted the wrong form and that McBeth would send Plaintiff the correct form.  Plaintiff completed and submitted this second form immediately.

65.     Both Defendant Sohler and Defendant McBeth failed to initiate any disciplinary procedures against this student.  On at least two occasions, Plaintiff also followed up with Dr Dorn, who was then the Chair of the Student Disciplinary, who said she was unaware of any professionalism reports for students from the EHS course.

66.     Defendant Sohler confided in Plaintiff in June 2019, that she believed that AP's behavior toward Plaintiff was motivated by racism.  However, Defendants went on to enable AP's racially motivated, abusive and manipulative behavior and punished Plaintiff for holding AP accountable for her poor behavior at AP's placement.

67.     As a result of not having a placement, AP was unable to fulfill the 192-hour field work requirement and AP was no longer actively enrolled in the EHS course.  Plaintiff was relieved to not have to have any further interaction with AP, because Plaintiff was afraid of AP, her ability to manipulate the truth and the out-sized influence AP's discriminatory animus had, made Plaintiff fear for her safety.

68.     Defendant Sohler conveyed that Plaintiff could either give AP a failing grade or an incomplete.

69.     Sohler told Plaintiff that after Plaintiff submitted the professionalism form to Defendant McBeth, the process would run its course, and Plaintiff would not have to deal with AP further. Had either Sohler or McBeth informed AP of this, or taken any other action, AP would not have shown up to Plaintiff's Mental Health First Aid workshop, which was part of the course AP was no longer permitted to take.

70.     When AP arrived at the course on a morning in July 2019 -- five weeks into the course -- Plaintiff and her coordinator were shocked and, although no one else was nearby, Plaintiff took great pains to discreetly let AP know that the course was only for students presently working at

Community Sites.  AP, embarrassed by her own error, went to Defendant McBeth, cried in his office, and told him that Plaintiff had publicly embarrassed AP.

71.     Although fully acquainted with the underlying facts and circumstances, Defendant McBeth responded by writing Plaintiff a scathing email, faulting Plaintiff for the situation, stating "you have to stop doing this".

72.     Plaintiff responded to receipt of this communication by reporting Defendant McBeth's inappropriate and racially biased conduct to the Cornell Clarke of CUNY Human Resources, Chief Diversity Officer Diana Cuozzo and Carol Huang, a representative of the Professional Staff Congress, among others, within days after the exchange in July 2019.

73.     While Defendant McBeth denied any wrongdoing in his treatment of Plaintiff, HR asked him to apologize to Plaintiff.  About a month later, McBeth went to Plaintiff's office and offered a non-apology: 'I don't think that I did anything wrong, but if you think that I did, then I'm sorry for that.'

74.     During a meeting in early November 2019 between Plaintiff and Defendant Sohler, Sohler made a revelation that shocked Plaintiff: AP -- the student dismissed, and to whom Plaintiff had given an incomplete grade to permit her to retake the EHS course the following year, rather than a failing grade ---- had "completed" her EHS requirement.

75.     Dumbfounded, Plaintiff asked what Sohler meant.  Defendant Sohler said, "we took care of that situation and she's completed the course."

76.     Previously, in or about June 2019, Plaintiff had been informed that it would be up to her as Course Director, to determine whether AP would receive a failing grade or an incomplete and permitted to repeat the course in 2020.  While Plaintiff questioned how, why and when AP had purportedly completed Plaintiff's course, rather than give any further explanation, three times

Sohler falsely insisted that she had informed Plaintiff previously.  Not only had she not informed Plaintiff of this backchanneling to pass one of Plaintiff's students, only a few months earlier, Defendants Sohler and Friedman had accepted Plaintiff's report that AP was going to receive an incomplete in the EHS course because she did not complete the required 192-hour Community Site placement; that acceptance had followed Defendant Sohler's acknowledgement that AP's misconduct had been motivated by racial hostility

77.    Plaintiff was very upset and asked Defendant Sohler what Sohler thought about the impact of that decision to let a student, who was dismissed from her site, get away with her unprofessional behavior and not complete her 192 hours of fieldwork when all of the other students had, sometimes under very challenging circumstances.  Plaintiff pressed further, 'What about undermining me as Course Director?"  Defendant Sohler offered no response, notwithstanding that she had previously stated that AP's behavior and treatment of Plaintiff was racially motivated, Sohler and the other Defendants suborned AP's misconduct and held the repercussions against Plaintiff, undermining Plaintiff as the course director

78.    Plaintiff told Sohler that she felt betrayed, disrespected and demeaned.  By giving AP a passing grade, without meeting the minimum threshold requirements (192 hours of field work), Defendants undermined the integrity of Plaintiff's work, her relationship with students, the legitimacy of the medical school transcript, and Plaintiff's hard work in cultivating relationships with Community Sites.

79.    While this student, AP, whose had been racially hostile to Plaintiff, and whose behavior was deemed so egregious by her preceptor that she was forbidden from being on the premises, was rewarded with a passing grade, without completing any of the 192 field placement hours required of her classmates, Plaintiff was subjected to repeat written and unwarranted attack by Defendants,

17

who perpetuated the false accusation that Plaintiff was somehow responsible for AP's dissatisfaction and embarrassment at the consequences of her own misconduct.

80.      Neither Plaintiff's white predecessors as the instructor and Director of the EHS course, nor any other faculty member outside of Plaintiff's protected class was subject to such undermining treatment.

<u>Plaintiff is Falsely Accused of Improperly Disclosing Student Grades</u>

81.      The January 13th Letter complains that Plaintiff should not have notified students herself about their dismissal from their Community Site, with a tenured faculty member present.  This colleague was a former director for the EHS course.  Although tenured, while Plaintiff was not, Plaintiff's colleague was similarly situated to Plaintiff because they were both bound by the same code of conduct with respect to student privacy and discipline.  She would never have agreed to be present, if she saw anything improper about what Plaintiff was doing. This colleague, the only person who ever offered any substantive guidance through the duration of Plaintiff's employment, was Dr. Erica Lubetkin, a tenured clinician and 21-year veteran of the CHASM department.

82.      After the death of the prior full-time course director, Dr. Lubetkin served as course director and taught the class in one of the intervening years between his death and the hiring of Plaintiff in January 2019.  She had full knowledge of the status of the course, so when Plaintiff reached out to the students, she also called Dr. Lubetkin, explained what happened and asked her if she would sit in as a witness to each discussion.

83.      In June 2019, Plaintiff had been trying for a few weeks to de-escalate a situation at a Community Site in the Bronx that 4 students were eventually dismissed from, with several trips back and forth to the site.  When these 4 students were ultimately dismissed for bullying their peer student volunteers at this Community Site, as the Course Director, Plaintiff had an obligation to

reach out to the students, who were dismissed, to inform them that they were not to report to their placements.

84. Plaintiff determined that this was not information that was appropriate to communicate via email, so she requested that the students come to her office, instead of reporting to their Community Sites. In advance of a full day of field evaluations in the Bronx that was to begin at 10:00am, Plaintiff met with each student privately beginning at 8:00am. At no point prior to the January 13th Letter was Plaintiff made aware that the Medical School or any of the Defendants considered that she had committed any infraction by conducting these meetings to notify her students. Dr. Lubetkin, who is not a member of Plaintiff's protected class but similarly situated with regard to standards of student discipline and privacy that applies to faculty and knowledge of the EHS course as a prior instructor received no similar criticism for her own participation.

85. The January 13th Letter also pointedly accused Plaintiff of scheduling these student meetings to frustrate Defendant McBeth's plans to meet with these students himself. On information and belief, Defendant McBeth's reported dissatisfaction with Plaintiff's handling of the situation and allegation of improper disclosures is merely retaliatory for Plaintiff having previously complained to the human resources department, Defendant Sohler, Defendant Friedman and others, about Defendant McBeth's discriminatory conduct towards Plaintiff, including his cover-up for a student's racist campaign against Plaintiff and report that the he had circumvented the curricular standards for that student, given her a pass in Plaintiff's course.

Plaintiff is Falsely Accused of Mistreatment of Students

86. In her January 13th Letter, Defendant Sohler, knowing that the claims were erroneous and without merit, referred to eight reports of mistreatment by Plaintiff, filed by students as part of the EHS course evaluations.

87.     On or about September 6, 2019, when Defendant Sohler and Plaintiff met to discuss these reports, Defendant Sohler was categorically dismissive of them stating that she learned that students apparently file them all the time.   Notwithstanding her apparent position that the complaint process was subject to abuse by students, Defendant Sohler expressly noted the lack of validity of these specific reports against Plaintiff.   All the reports "mentioned public embarrassment," all of which Sohler knew to be inaccurate.

88.     As Sohler was entirely aware, prior to drafting the January 13th Letter, seven of the eight putative reports referenced the same alleged incident, using identical language, and alleged merely hearing about public embarrassment of a student (not the student purportedly making the complaint).   There were no facts to substantiate their accuracy and they are part of an apparent campaign against Plaintiff for permitting the dismissal for cause of AP from her placement.

89.     Critically, the eighth complaint referenced an experience of discrimination suffered by a student at her Community Site placement and was unrelated to anything said or done by Plaintiff.

90.     When Plaintiff reported to Defendant Sohler that this student had come to Plaintiff to report the incident and that Plaintiff had removed this site from the active list to protect future students, Defendant Sohler, verbally noted that the student did not understand that the mistreatment form was not supposed to be used for external experiences and that Plaintiff had not done anything wrong.   Nevertheless, Sohler knowing that these were not independent or legitimate mistreatment complaints, deliberately and manipulatively presented them in her January 13th Letter as if they were actually reflective of Plaintiff's performance.

91.     No other faculty member outside of Plaintiff's protected class was subject to similar mistreatment of being repeatedly accused of knowingly false accusations against Plaintiff.   This was made all the more egregious by the fact that Defendant Sohler had previously acknowledged

that the actions of AP were racial motivated, and knowingly false complaints about AP's treatment by Plaintiff was being adopted as a pretext to discipline Plaintiff

92.     Defendant Sohler additionally referenced in the January 13th Letter Defendant McBeth's email to Plaintiff in July 2019 claiming that a student AP (who was dismissed from the placement for cause), felt embarrassed by Plaintiff's conduct, as detailed further *supra*.  As Defendant McBeth had been asked to apologize for his communication with Plaintiff, after Plaintiff complained to human resources, Plaintiff was stunned that it was restated in Defendant Sohler's letter as if it were a valid reproach of Plaintiff's conduct, and not abusive conduct that was tinged with racial animus and supported the racially motivated abusive actions of AP.

Plaintiff's Course Load is Subject to Disparate Scrutiny

93.     Within CHASM, Faculty are expected to facilitate problem-based learning sessions, a case study approach to learning problem solving in different core areas ("PBLs").  The January 13th Letter requests that Plaintiff identify the PBLs for which she would be "volunteering" in the upcoming Fall and Spring terms.

94.     While faculty are asked to facilitate these sessions (4-2-hour sessions per module), in the semester, when one's own course is not in session, actual faculty participation is uneven.  Not long after insisting that Plaintiff's course grades were overdue because EHS was a Spring term course, Sohler demanded that Plaintiff "volunteer" to facilitate PBLs in the Fall and Spring because Plaintiff was only teaching a summer class.

95.     Other faculty, who are not members of Plaintiff's protected class, were permitted to entirely ignore requests to facilitate PBLs and at least two other, faculty, who are not members of Plaintiff's protected class, came into the office on just one day a week for a few hours to teach a single course,

during Plaintiff's employment.  On information and belief, this disparate treatment was racially motivated and in retaliation for Plaintiff having complained about discriminatory treatment.

96.     Plaintiff shadowed a faculty member during the first module, then facilitated 3 PBL modules in the Fall of 2019.  When Sohler asked Plaintiff to facilitate, a specific PBL in the Spring 2020 term, Plaintiff expressed her apprehension about working with the class that she had just taught in the summer, where some students had levelled such negative personal attacks against Plaintiff.

97.     Notably, a mandated, school-wide diversity training replaced two of Plaintiff's lectures in the midst of the course; the mandate was in response to serious racial incidents that had taken place before Plaintiff arrived at CUNY and had been poorly handled.  This cohort, which had produced the seven specious (and one in error), mistreatment reports, also was permitted to report racist microaggressions against Plaintiff as legitimate feedback, including:

- o  'She's inarticulate'
- o  'She has this thing about being called 'doctor''
- o  'She's only concerned about her appearance'
- o  'What kind of class is this to lecture us about white supremacy, what kind of school is this, she should be fired…'  -- a topic and phrase Plaintiff never used with her students but was instead part of the mandatory school-wide diversity training that replaced one of Plaintiff's class sessions.

98.     During her time working at Defendant CUNY, while it was the norm to refer to faculty and staff with PhD or MD degrees as "Doctor", Plaintiff and another Black staff member, with a doctorate degree, were routinely referred to by students by their first names.

99.     Around the same time, another Black faculty member at the Medical School, privately agreed that as some of the few Black, female faculty (a group that historically faces greater scrutiny

in front of the classroom), they were particularly uncomfortable facilitating these PBLs because facilitators are (by design), not subject matter experts in the subject of the particular PBL.

100.    Notably, after Plaintiff's unlawful termination, in or about Fall 2021, Assistant Dean of Diversity Equity and Inclusion, Lynn Hernandez, gave a presentation about the challenges faced by Black women faculty, including addressing things like the equity and impact of course evaluations such as were experienced by Plaintiff.

101.    As Plaintiff had had a positive experience with the medical students, in the M1 and M2 classes, she reached out to the PBL organizer and volunteered for open slots with those students. Plaintiff never received a response and when she followed up again there were no openings.

102.    Defendant Sohler received a report of the dates Plaintiff facilitated PBLs in the Fall.  The high evaluations from these Fall 2019 PBL coursers were notably not included in the annual review of Plaintiff's performance

Plaintiff Was Largely Excluded from Institutional Committees

103.    As a former assistant director of admissions at the University of Vermont, Plaintiff was eager to contribute to the admissions process at the Medical School.  She volunteered to interview prospective students and proceeded to interview three students a week for the duration of the interview period.  Most faculty conducted 2 per week, but Plaintiff enjoyed interviewing and was told in the January 13th Letter that she would be placed on the Admission Committee in the following year.  As Plaintiff was terminated, she never received that committee appointment.

104.    Plaintiff also volunteered for the Staff Search Committee, which was looking to hire a coordinator who would work extensively with Plaintiff.  Ultimately her request was denied, in part because Defendant CUNY admitted it wanted to fill the vacancy with a white committee member.

105.    During Plaintiff's employ, another clinical professor, a white doctoral candidate, who has completed required courses and examinations, but has still not written or defended a dissertation several years later (a status known in academia as "ABD"), was invited to chair the Student Disciplinary Committee for the Medical School.  Incredibly, while Plaintiff was challenged by a white subordinate about the legitimacy of having her credentials on her door name plate, in accordance with the standard for all faculty, this ABD faculty member has a door name plate that falsely indicates she is a Doctor, when she is not.

106.    While the Department Chair appeared to be the one to designate who should sit on committees, for the duration of Plaintiff's employment, Plaintiff was never placed on a committee or invited to service on one in any capacity, while less qualified, and similarly situated white faculty received appointments and leadership positions

Plaintiff is Falsely Accused of Sharing Student Health Information

107.    A student in Plaintiff's EHS course had an emergency and reached out to Plaintiff for support.  Plaintiff supported the student and reminded the student to report her absences to Student Affairs as soon she was able to.  This was set forth in the January 13th Letter as a failure of Plaintiff to enforce the Medical School's attendance policy and breach of student confidentiality, although Plaintiff revealed no details to Defendant Sohler.

108.    This banal criticism was a pretextual reason for further harassing Plaintiff, who had been objecting to her discriminatory treatment, and no other faculty outside of her protected class was subjected to similar scrutiny.

109.    While Plaintiff could quantify her work and show significant achievement, she was harassed, while no faculty outsider Plaintiff's protected class received any scrutiny whatsoever.

110.     No confidential grade information was shared with faculty outside of the course.  As noted below, assignments were not graded, and grades tabulated until the end of field work.

Defendant Sohler Asks for Community Site Date That She Already Has Access To

111.     In the January 13th Letter, Sohler requested a report outlining the status of the Community Sites – existing sites, discontinued sites, sites newly cultivated by Plaintiff and predictions of any need for additional sites -- and it was provided to her by Plaintiff.  On this report, Plaintiff also shared a link to the Excel spreadsheets, where she maintained in-depth and detailed information about the Community Sites and preceptors.

112.     The data that Plaintiff used to generate the summary she provided to Sohler was available in greater detail within the shared directory, the repository for information for all of the courses taught in the CHASM department and was therefore already fully accessible to Defendant Sohler, before Sohler's request and for the period throughout Plaintiff's employment.  Sohler had asked for the information previously, in or about the Fall 2019, and it was provided by Plaintiff then as well.

113.     Plaintiff also explained that the list of Community Sites would not be considered final until about March of 2020, because things changed at the Community Sites all of the time; for example, someone might retire/resign/change positions/become too busy and then the Medical School has to suddenly secure new opportunities.  Plaintiff explained that March 2020 would be the firm deadline because students would then have to be placed, notified of their placements, and requested to begin a lengthy onboarding process (sometimes as long as 8 weeks, including extensive background checks, medical clearance, and mandatory trainings), before starting the EHS orientation at the end of May 2020.

114.    Typically, a Department Chair would not request, because they do not need, the level of minutia that Sohler requested.  No previous faculty in Plaintiff's position, nor any of her peers outside of her protected class were asked for such tedious and redundant reporting.  On information and belief, the onerous request was made merely to harass Plaintiff because of her race and her complaints of discrimination, manufacture work, make it easier for Sohler take over Plaintiff's professional relationships and otherwise diminish Plaintiff's accomplishments, and to transfer the work away from Plaintiff, which Sohler did only several weeks later.

Plaintiff's Request to Establish a Course Budget is Undermined

115.    Plaintiff had made multiple inquiries regarding establishing a budget for her EHS course and had discussed it with Defendant Sohler in November 2019.  Plaintiff was eager to hire adjuncts and prepare for the upcoming 2020 EHS course.  At that point, Plaintiff was only asking for budget support on a going forward basis, because she knew that there was so much travel through the previous session that was never recorded, because there was no way for Plaintiff to be compensated for it.

116.    In response to Plaintiff's request to establish a budget for the EHS course, in the January 13th Letter, Defendant Sohler made the ridiculous demand that Plaintiff provide a record of her time and travel from the whole prior year.  This followed Plaintiff having previously offered an estimate of travel expenses based on her prior experience, when she prepared her draft course budget and Defendant Sohler's prior acknowledgements of Plaintiff's intense field schedule.

117.    Defendant Sohler's request, while perhaps facially benign, is predicated on her foreknowledge that Plaintiff had absorbed all of her own travel expenses and scheduled her own travel at her convenience, and, without the possibility of reimbursement, could not provide the level of detail of meetings and travel Sohler requested.

118.   This is yet another opportunity taken by Defendants to create a pretext for Plaintiff's discriminatory disparate treatment and ultimate termination, standard not applied to faculty outside of Plaintiff's protected class.  Faculty members who are not members of Plaintiff's protected class, and who Defendant Sohler described as unproductive for years, received no similar requests for information.

119.   Similarly, when Plaintiff had requested monies to attend the American Public Health Association Conference in Philadelphia in or around November 2019, she was denied an allowance of $1,000, purportedly because she would not be speaking at the conference.  Plaintiff attended at her own expense.

120.   Also in or around November 2019, Defendant Friedman, approved and paid for ten clinical faculty members and staff to attend the Annual meeting of the Association of the American Medical College ("AAMC") in Arizona, at a cost of $45,000.00.  None of these faculty were presenting at the conference either, the pretextual reason for denying Plaintiff funding.  On information and belief, none of the faculty members funded for the AAMC conference are members of Plaintiffs, protected class.

121.   In the following year, Defendants again approved the cost of attendance for AAMC (at a reduced cost, because it was virtual), and again denied Plaintiff funding to attend a professional conference, the National Collaborative for Education to Address the Social Determinates of Health at the Northwestern School of Medicine.  This was removed from Plaintiff's 2020 budget submitted to Defendant Sohler in or about October 2019.

122.   Plaintiff was also never reimbursed for her work-related travel.

Plaintiff Is Given an Artificial Deadline to Revise Her EHS Course Syllabus

123.    In the January 13th Letter, Defendant Sohler requested to receive a revised syllabus from Plaintiff by the following week.  However, Sohler was aware that the Curriculum Committee was supposed to review it and offer recommendations to ensure alignment with curriculum and had not done so.

124.    In August of 2019, Sohler informed Plaintiff that since the EHS course had not been reviewed by the Curriculum Committee since the death of the last full-time course director, five years prior, it would be reviewed at that time.  Sohler went out of her way to mention that the request and the process was not intended to be antagonistic but was designed to be helpful.  Sohler also suggested that Plaintiff prepare Plaintiff's modifications in light of student feedback.

125.    As the 2019 EHS course progressed, Plaintiff had been mortified by some of the Community Sites that she inherited and the lack of support from her coordinator (who had been searching for another position for over a year), and her inherited adjunct professors.  Early in the term, she was also very distracted by students who were dismissed by some of the Community Site placements for misconduct on the part of the students.

126.    Plaintiff realized that she had to dramatically re-vamp the EHS program with additional, new Community Sites, new and/or reinvigorated preceptors, and provide students with a clearer understanding of the goals and objectives of a service-learning experience in the context of the rest of their training, help them to understand clinical empathy and its significance, and introduce better methods of skill development.  Plaintiff also knew that she hoped to completely take over the teaching of the course, and only request the new adjuncts to support with lectures reinforcing research methods.

127.     In Plaintiff's initial report to Sohler, she shared her plans for enhancing the EHS course. Since Plaintiff had not received any substantive guidance with the EHS course nor its role in the overall Medical School curriculum, she welcomed an opportunity to revise her syllabus with input from the larger Medical School community through the Curriculum Committee and in consideration of recent student experiences.

128.     There were numerous attempts by Plaintiff to schedule the meeting with the Curriculum Committee, but each attempt was aborted by Dean Rosa Lee, who chaired the committee.  Finally, she was told that her syllabus would not be reviewed until December 2019, but it was ultimately not reviewed then either.

129.     Nevertheless, Plaintiff submitted a comprehensive syllabus to Defendant Sohler in early 2020 but told Sohler that it was still a work in progress, because Plaintiff was still awaiting the promised feedback from the Curriculum Committee.

130.     The administrator overseeing the submission of syllabi told Plaintiff that as Plaintiff's EHS course did not begin until May 2020, Plaintiff had more time to submit her syllabus.

131.     This stood in sharp contrast to Defendant Sohler's representations to Plaintiff.  In mid-Fall of 2019, Sohler informed Plaintiff that Plaintiff's syllabus and budget (including the hiring of her adjunct professors), were late.  After an extensive search, Plaintiff had identified her adjunct professors by the end of December 2019.  By January 2020, she was working with the CHASM Department administrative specialist for the formal hiring process of the adjunct professors for her EHS course.  Defendant Sohler met the two perspective hires, and requested their contact information and resumes, which were provided to her by Plaintiff immediately.

132.     Despite Plaintiff's clear progress, the indefinite delay by the Curriculum Committee, and the Medical School Administrator advising that Plaintiff's materials were not yet due, Sohler

imposed a false deadline to force Plaintiff to scramble to complete non-pressing tasks. No other faculty outside of Plaintiff's protected class were subject to similar demands.

Plaintiff is Not Observed During Her Course Instruction, Despite Plaintiff's Invitations to Sohler

133.    In the January 13th Letter, Defendant Sohler asked Plaintiff to provide her dates to observe Plaintiff teaching, in compliance with a Medical School annual requirement. However, not only was Plaintiff's schedule known or knowable to Sohler, but it was also Sohler's own oversight that had prevented her observing Plaintiff during the previous eight months.

134.    In the meeting between Plaintiff and Sohler on or about September 6, 2019, Sohler told Plaintiff that Sohler had forgotten to observe Plaintiff when Plaintiff's EHS class was in session. Thus, Sohler would have to observe Plaintiff during her facilitation of PBLs. While Plaintiff knew that such a situation was less than ideal, because the learning in PBLs was, by design, largely self-directed and the assigned faculty member is merely a facilitator. Nevertheless, as requested by Defendant Sohler, Plaintiff provided Sohler with the dates for three opportunities to observe Plaintiff in early October 2020, during her first PBL module that term.

135.    Defendant Sohler confirmed her attendance for one of those dates via email, but then never showed up.

136.    Believing that perhaps Defendant Sohler had been taken away to other matters, or that she may have simply forgotten, Plaintiff wrote to Sohler and said that she would be facilitating again on another date. However, Plaintiff never heard from Sohler again about observing Plaintiff.

137.    In a meeting in or about November 2019, when plaintiff was sharing about her January 2020 course pre-orientation, she asked Sohler to save the date because it would give Sohler an opportunity to observe Plaintiff. Plaintiff believed the invitation was appropriate, as the prior chair attended Plaintiff's previous orientation, even contributing.

138.    Given the voluminous, disingenuous and inaccurate statements by Defendant Sohler in the January 13th Letter, Plaintiff responded to it by immediately making a complaint to Defendant Friedman and the Assistant Dean of Diversity, Equity and Inclusion, both of whom had already been long been aware that Plaintiff was being subjected to harassing and disparate treatment by Defendant Sohler and Defendant McBeth.

139.    After repeated requests by Plaintiff to meet with Defendant Friedman, she met with Plaintiff in or about December 2019.  Although the requested purpose of the meeting was to discuss Plaintiff's concerns about Defendants Sohler and McBeth, Defendant Friedman merely advised Plaintiff to "just overlook Dani's [McBeth's] Irish temper," and refused to discuss anything further.

140.    On information and belief, at least one other member of Plaintiff's protected class made similar complaints to Defendant Friedman and Defendant Sohler, and Friedman took no action in that instance either.

141.    Subsequently, in or about December 2019, Plaintiff again met with Assistant Dean of Diversity, Equity and Inclusion and Chief Diversity Officer, among others, to report these most recent concerns.

142.    At that time, Plaintiff did not take additional steps to pursue her complaints within CUNY, because she feared further reprisal.

143.    Her concerns were not unfounded.  Each of her prior complaints – of which Defendants were all aware, having advised her to initiate them in the first place and then responding to inquiry from human resources -- were followed by escalating mistreatment of Plaintiff by Defendants, principally Defendant Sohler.

144.    Further in or about the Fall of 2019, Plaintiff become aware of another department head and senior executive in the Medical School, who had publicly berated staff members for not giving positive feedback on their experiences in the department and retaliated against them for complaining of discrimination.  This followed representations to the staff and faculty about confidentiality in complaints of discrimination and a racially hostile work environment, which were then apparently dishonored by Defendant CUNY.  Although both her union and human resources made additional, unsolicited inquiry to Plaintiff, into the discriminatory treatment faced by Plaintiff, learning of multiple examples of the confidentiality of discrimination complaints being breached, elevated Plaintiff's concern that further pursuit of internal complaints of discrimination would result in further retaliation against her.

<u>Plaintiff Receives a Poor Annual Review Rife With False Claims</u>

145.    On or about March 3, 2020, Plaintiff was emailed a poor Annual Review written by Defendant Sohler (the "Annual Review"), which failed to acknowledge any of Plaintiff's accomplishments, made disingenuous accusations about purported shortcomings and recited knowingly false allegations about Plaintiff's performance, largely echoing the January 13th Letter.

146.    The Annual Review restated Defendant Sohler's purported need for detailed information in Community Sites and claimed that Sohler did not have a final list of Community Sites or information on their status.  Defendant Sohler deliberately and conspicuously omitted that she had full access to all available data regarding Community Sites, and full knowledge that the existing information could not be deemed final until March 2020.

147.    Defendant Sohler failed to acknowledge the work that Plaintiff had done to secure a substantial number of new Community Sites to accommodate a record number of student placements in the EHS course.  Sohler feigned ignorance of the problems with the withdrawing

Community Site, despite being well aware of the problem of CUNY students being dismissed for bullying other students at that site, implying that Plaintiff had not disclosed what had occurred.

148.    Defendant Sohler reported that Plaintiff was only working 32 hours of PBL work.  Of course, Sohler did not include that several other faculty members worked substantially less, including some working none at all.  None of these faculty members outside of Plaintiff's protected class received similar criticism.

149.    Defendant Sohler stated that she had not received a final syllabus from Plaintiff, failing entirely to disclose that she had received a revised syllabus, the Medical School had advised that the syllabus was not yet due for Plaintiff's EHS course, and that it was subject to review by the Curriculum Committee, who as of the February writing of the Annual Review, had not reviewed Plaintiff's syllabus.

150.    Although Defendant Sohler had told Plaintiff in November 2019, that the student AP, who had been dismissed from her placement and refused re-placement, had 'been taken care of' and was given a passing grade, rather than the incomplete given by Plaintiff, on Plaintiff's Annual Review, Sohler masks this covert undermining of Plaintiff by referring to AP's grade as "incomplete".

151.    Perhaps most gratuitously pretextual of all, Defendant Sohler reiterated six fabricated failures attributed to Plaintiff in the January 13th Letter: late grades, failure to use professionalism form for student dismissals, multiple mistreatment forms filed, mid-course feedback not given, attendance and confidentiality.  The parenthetical feedback offered after each remark constitutes a suggestion to include notes on Plaintiff's syllabus relevant to five of the items, and a recommendation to "consider scheduling regular meetings with class reps or other intervention")

to address the specious mistreatment reports that had precipitated as part of AP's racially discriminatory motivated behavior that was acknowledged by but also suborned by Defendants.

152.    After Sohler forgot to evaluate Plaintiff during Plaintiff's EHS course, and then failed to show up to scheduled alternative date, Defendant falsely state that Plaintiff had failed to give Sohler dates to observe Plaintiff, and therefore she could not evaluate Plaintiff's performance, when she finally came to observe Plaintiff for about an hour in January 2020, during Plaintiff's orientation for the EHS course.  Defendant Sohler thereafter reported to the Assistant Dean of Diversity Equity and Inclusion, Lynn Hernandez that Plaintiff had "done great", a complement that stands in contrast to Defendant Sohler's false and critical statements of Plaintiff in Plaintiff's pretextual termination

153.    For the first time in the Annual Review, Defendant Sohler criticized Plaintiff for not publishing papers, nor procuring any grants.  While, tenure-track faculty routinely pursue grants and are published, clinical professors do not.  The criticism by Sohler held Plaintiff to a different standard based on her race, as other clinical faculty, who are not members of Plaintiff's protected class, were not asked to write grants or publish papers (and did not do so).

154.    Sohler curiously describes the EHS course as a 6-week course commitment for a full-time clinical professor, failing to mention that the course is 8 weeks, and included for Plaintiff, not just class instruction, Community Site supervision, securing, cultivating and training 50 new field site opportunities, and re-orienting preceptors that were maintained.  As Sohler had previously acknowledged, Plaintiff spent most of every day out in the field, and then worked into the evening most days of the week.  Defendant Sohler deliberately omitted this from her evaluation of Plaintiff to obfuscate Plaintiff's accomplishments, to support Plaintiff's eventual pretextual termination.

155.     Similarly, Defendant Sohler credited Plaintiff with merely helping an Associate Dean facilitate a program at the Medical School, when in fact, the featured speaker, the former head of the NYC Health and Hospitals Corp., was a professional acquaintance of Plaintiff and had come the Medical School at Plaintiff's sole invitation as a community building opportunity.  Defendant Friedman encouraged all faculty to attend, and they did.  There were no empty seats in the room. The details of the program were omitted to mask the accomplishments of Plaintiff and Defendant Sohler instead gave primary credit for the event to a faculty member, who is white, and who did not participate in creating or facilitating the program.

156.     Defendant Sohler recites that Plaintiff was denied funding for a professional development opportunity, then, falsely alleges that Plaintiff had no professional development, when in fact Plaintiff went to the program at her own expense, as described *supra.*

157.     Sohler concludes her Annual Review of Plaintiff, by falsely asserting that she has received no documentation about what Plaintiff was working on, implies that Plaintiff had been disingenuous about her representations regarding how Plaintiff spent her professional time and that Plaintiff had ignored corrective feedback, including Sohler's demonstrably untrue January 13th Letter.

158.     Rather, Defendant Friedman and Defendant Sohler had long had a complete record of the substantial number of new relationships cultivated for Plaintiff's EHS course.

159.     Plaintiff alleges that the Annual Review was a pretextual exercise, calculated to mask the disparate treatment that Plaintiff received because of her race and in retaliation for her numerous complaints about the hostile work environment in which she had labored.

## **Following Her False Review, Plaintiff Was Denied Re-appointment**

160.    On or about March 12, 2020, in a letter emailed and hand delivered to Plaintiff, the Executive Faculty Committee -- which on information and belief was all white, and included no Black members, and on further information and belief, included Defendants Sohler, Friedman and McBeth -- denied Plaintiff reappointment, terminating her employment effective on or about August 26, 2020.

161.    While some of the changes made to Plaintiff's EHS course were precipitated by the Covid Pandemic, the program continued to operate as a required part of the Medical School curriculum; only Plaintiff was removed as Course Director and given lower-level administrative work, not related to the position that she was hired for.  The tasks were make-work, had no urgency and received no response when they were completed.

162.    The stress of the racially hostile work environment under which Plaintiff was forced to labor, caused her to require a medical leave of absence, which was documented and approved.

163.    While Defendants terminated Plaintiff, Defendant CUNY, its Medical School, and the CHASM Department in particular, included faculty, who are not members of Plaintiff's protected class and who had not complained about discrimination, but who, on information and belief, received lower course evaluations than Plaintiff, received student complaints, submitted grades late, did not publish any papers or engage in other activities, the absence of which was used to justify penalizing Plaintiff.  These other faculty members were not subjected to the discriminatory treatment Plaintiff received.  Rather they were left to their own devices to teach their course as they saw fit, with no attempt to undermine their standing as faculty or to hijack their professional relationships in the community.

164.     Simultaneously, a Black dean leading a co-located CUNY program at Defendant CUNY's City College (where the Medical School is located), left her position, expressly naming the ill-treatment of Black faculty, Black women in particular, as the reason for her departure after only approximately 10 months at Defendant CUNY.

165.     Rather than continue her EHS course within Covid-necessitated modifications, the entirety of the program, which Plaintiff had grown and fostered was removed from her responsibilities and initially taken over by Defendant Sohler.  Days later, on March 19, 2020, via an email letter, Plaintiff was demoted and reassigned to administrative tasks that were a significant diminution of her material responsibilities as course director of EHS, to further demean and humiliate her in her terminal six months.

166.     Defendant Sohler took over organizational relationships that Plaintiff cultivated to be used by others, although Defendants had previously contended (falsely), that these relationships were inadequate to satisfy Plaintiff's job duties.

167.     The course of Plaintiff's treatment by Defendants -- professional isolation, a lack of professional support, microaggressive behaviors by superiors, open chastisement in front of students and then rewarding students who were racially abusive towards Plaintiff, giving credence to knowingly erroneous reports of alleged misconduct by Plaintiff, asking her to volunteer to facilitate a course, where some of the students had made racist comments about Plaintiff – are examples of a larger, systemic pattern of racism and the fostering of a hostile work environment on the basis of Plaintiff's race.

168.     This pattern includes, for example, the hostile work environment and retaliation that Plaintiff learned of in another department in the Medical School, as described *supra*.

169.   As another example, Plaintiff learned in the Spring 2020, a Black woman and highly qualified candidate, Dr. Sirry Alang, was invited to give a talk as part of the consideration of CUNY offering her a senior faculty position.  She gave a job talk "Experiences of Racism as Related to Utilization of Health Services" and she also asked Friedman about the climate for Black academics at the Medical School.  After her presentation, the CHASM department unanimously recommended Dr. Alang for the senior faculty role.

170.   However, behind closed doors, the search committee, which was made up entirely of non-Black members, considered Dr. Alang "too militant" because of the topic of her talk and her direct questioning of Defendant Friedman regarding the treatment of Black faculty.

171.   Another, white candidate who also talked about health disparities, was not considered militant by the committee.  While the position was ultimately, offered to a person of color, the bias expressed against Dr. Alang, as not 'the right type of Black person', reflects the continued and insidious condition of a hostile work environment by Defendants based on race, and the adverse consequences for people in Plaintiff's protected class, who openly opposed to it.

## FIRST CLAIM FOR RELIEF

**[*as against CUNY*]**
**[Race, Color, in Violation of Title VII]**

172.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

173.   Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under Title VII based on her race.

174.   CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Miller-Sethi on the basis of her race.

175.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

176.    CUNY knew that its actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutory rights.

177.    As a direct and proximate result of CUNY's conduct in violation of Title VII, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

178.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SECOND CLAIM FOR RELIEF

### [*as against CUNY*]

### [Hostile Work Environment Based on Race in Violation of Title VII]

179.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

180.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY.

181.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, in violation of Title VII.

182.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

183.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### THIRD CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title VII]

184.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

185.    Pursuant to the acts and practices of CUNY as alleged above, Plaintiff complained to CUNY's HR staff, of the discrimination based on her race, and thus, was engaging in a protected activity pursuant to Title VII.

186.    CUNY knew or should have known of the unlawful acts and practices same yet failed to act promptly to prevent or end the harassment and discrimination, and instead knowingly permitted it to continue in retaliation for Plaintiff opposing discriminatory behavior.

187.    Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that she suffered and the hostile work environment that was created thereby. CUNY, then refused to re-appoint Plaintiff, demoted her and subjected her to an antagonistic and inhospitable work assignment as retaliation for making internal complaints about discrimination, in violation of Title VII.

188.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

189.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### FOURTH CLAIM FOR RELIEF

[*as against CUNY*]

**[Discrimination Based on Race in Violation of Title VI]**

190.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

191.    Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under Title VI based on her race.

192.    On information and belief, and at all times relevant hereto, CUNY received, and continues to receive, federal financial assistance.

193.    CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Miller-Sethi on the basis of her race these discriminatory practices negatively affect the delivery of services to faculty, students at the Medical School, the community served by the EHS program and other, ultimate beneficiaries of the federal financial assistance enjoyed by CUNY.

194.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

195.    CUNY knew that its actions constituted intentional unlawful discrimination, showed deliberate indifference and/or reckless disregard for Plaintiff's statutory rights.

196.    As a direct and proximate result of CUNY's conduct in violation of Title VI, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

197.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FIFTH CLAIM FOR RELIEF

### [Hostile Work Environment Based on Race in Violation of Title VI]

198.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

199.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was intentionally subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY.

200.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, showing deliberate indifference and/or reckless disregard for Plaintiff's statutory rights, in violation of Title VI.

201.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

202.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### SIXTH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title VI]

203.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

43

204.    Pursuant to the acts and practices of Defendant as alleged above, Plaintiff made complaints Defendant's HR staff of the discrimination based on her race, and thus, was engaging in a protected activity pursuant to Title VI.

205.    CUNY knew or should have known of the unlawful acts and practices yet acted with deliberate indifference and/or reckless disregard for Plaintiff's rights, and failed to act promptly to prevent or end the harassment and discrimination CUNY.

206.    Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that she suffered and the hostile work environment that was created thereby. CUNY, then refused to re-appoint Plaintiff, demoted her and subjected her to an antagonistic and inhospitable work assignment as retaliation for making internal complaints about discrimination, in violation of Title VI.

207.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

208.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SEVENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Discrimination Based on Race in Violation of Section 1981]

209.   Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

210.   The Individual Defendants, in their individual capacities, intentionally discriminated against Miller-Sethi on the basis of her race, thus depriving Miller-Sethi of rights, privileges, and other beneficial terms of her contractual employment, in violation of Section 1981.

211.   As a direct and proximate result of Individual Defendants' discriminatory conduct described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

212.   The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## EIGHTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Hostile Work Environment Based Race in Violation of Section 1981]

213.   Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

214.     By the intentional discriminatory acts and practices of the Individual Defendants in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her contractual employment with CUNY.

215.     As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

216.     The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## NINTH CLAIM FOR RELIEF

**[*as against the Individual Defendants, in their individual capacities*]**

**[Retaliation in Violation of Section 1981]**

217.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

218.     By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff for her opposition to conduct that violated her rights and privileges in her contractual employment in violation of Section 1981.

219.    As a proximate result of the Individual Defendants' intentional retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

220.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

<h3 style="text-align:center">TENTH CLAIM FOR RELIEF</h3>

[<em>as against the Individual Defendants in their individual capacities</em>]

<strong>[Discrimination Based on Race in Violation of Section 1983]</strong>

221.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

222.    The Individual Defendants, in their individual capacities, acting under color of law, custom or usage, discriminated against Miller-Sethi on the basis of her race, thus depriving her of her rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

223.    As a direct and proximate result of Individual Defendants' discriminatory acts described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss

of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

224.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### ELEVENTH CLAIM FOR RELIEF

[*a as against the Individual Defendants, in their individual capacities*]

[**Hostile Work Environment in Violation of Section 1983**]

225.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

226.    By the discriminatory acts and practices of the Individual Defendants acting under color of law, custom or usage, in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of her work environment during her employment with CUNY, depriving Miller-Sethi of rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

227.    As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

228.     The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

**TWELFTH CLAIM FOR RELIEF**

[*as against the Individual Defendants, in their individual capacities*]

**[Retaliation in Violation of Section 1983]**

229.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

230.     By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, under color of law custom or usage, have retaliated against plaintiff for her opposition to conduct that violated her rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

231.     As a proximate result of the Individual Defendants' retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

232.     The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## THIRTEENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Discrimination based on Race in Violation of Executive Law]**

233.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

234.    The Plaintiff is Black woman of African-American descent and is thus a member of a protected class under the Executive Law based on her race.

235.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the Executive Law, by taking adverse action against Plaintiff directly because of her race and aided, abetted, incited and/or compelled CUNY in discriminating against Plaintiff.

236.    As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the Executive Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## FOURTEENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Hostile Work Environment Based on Race in Violation of the Executive Law]**

237.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

238.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to and aided, abetted, incited and/or compelled CUNY in subjecting Plaintiff to, a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter the conditions of her work environment during her employment with CUNY, in violation of the Executive Law.

239.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## FIFTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Retaliation in Violation of Executive Law]

240.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

241.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of her employment, including by creating a hostile work environment and aided, abetted, incited and/or compelled CUNY in discriminating against Plaintiff.

242.    CUNY in its retaliation against Miller-Sethi for her protected activity, in violation of the Executive Law.

243.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## SIXTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Discrimination Based on Race in Violation of the City Law]

244.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

245.    Plaintiff is a Black woman of African-American descent and is thus a member of a protected class under the City Law based on her race.

246.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the City Law, by taking adverse action against Plaintiff directly because of her race and aided, abetted, incited and/or compelled CUNY in discriminating against Plaintiff.

247.    As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the City Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss

of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

248.    The Individual Defendants' unlawful conduct amounts to either willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

<u>**SEVENTEENTH CLAIM FOR RELIEF**</u>

[*as against the Individual Defendants in their individual capacities*]

[**Hostile Work Environment Based on Race in Violation of the City Law**]

249.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

250.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to, and race and aided, abetted, incited and/or compelled CUNY in subjecting Plaintiff to a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter the conditions of her work environment during her employment with CUNY, in violation of the City Law.

251.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

252.    Defendant's conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## EIGHTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Retaliation in Violation of the City Law]

253.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

254.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of her employment, including by creating a hostile work environment and aided, abetted, incited and/or compelled CUNY in its retaliation against Miller-Sethi for her protected activity, in violation of the City Law.

255.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

256.    The Individual Defendants' conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectively request that this Court enter a judgment providing the following relief:

a)      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, State of New York and the City of New York;

b)      An injunction and order permanently restraining Defendants, their partners, officers, owners, agents, successors, heirs, employees, assigns and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c)      Directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment, including restoring positions and duties to Plaintiff that have been taken away;

d)      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, and other benefits of employment;

e)      An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, physical illness, emotional pain and suffering, and emotional distress;

f)      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, lost income, reputational harm, and harm to professional reputation, in an amount to be determined at trial;

g)      An award of punitive damages in an amount to be determined at trial;

h)      Liquidated damages in an amount to be determined at trial;

i)      Prejudgment interest on all amounts due;

j)      An award of costs that Plaintiff has incurred in this action, including, but not limited costs of expert witnesses and reasonable attorneys' fees and costs to the fullest extent permitted by law; and

k)      Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR A TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: Dated:  April 7, 2022
New York, New York

JASPER & JASPER, PLLC

BY: /s/ Zoë E. Jasper
     Zoë E. Jasper
     zoe@jasperpllc.com
     17 State Street; Suite 4000
     New York, New York 10004

## VERIFICATION

STATE OF _New York_        )

                             ) ss.:

COUNTY OF  _New York_     )

      FAITH MILLER-SETHI, being duly sworn, depose and say: I am the Plaintiff in the within action; I have read the foregoing Verified Amended Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

_Faith Miller-Sethi_

FAITH MILLER-SETHI

Sworn to before me this 8th
day of _April_ , 2022

_____
Notary Public

JIMMY MA
Notary Public, State of New York
No. 01MA8116017
Qualified in New York County
Commission Expires Sept. 20, 2024